**HAEHN MANAGEMENT
COMPANY, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 435–86C.

United States Claims Court.

May 31, 1988.

Patrick J. Duffy, Universal City, Cal., for plaintiff. G. Robert Hale, Monteleone & McCroy, and Richard D. Corona and Robert C. Baumgarten, of counsel.

Scott P. Boylan, Washington, D.C., with whom was Asst. Atty. Gen. John R. Bolton, for defendant. Audrey Van Dyke, Dept. of the Navy, of counsel.

## OPINION

NETTESHEIM, Judge.

This contract case is before the court after trial. Defendant has submitted a post-trial brief.

## BACKGROUND

On July 8, 1986, plaintiff Haehn Management Company ("Haehn"), a prime contractor, filed suit on behalf of itself and its subcontractor CCS Construction Co., Inc. ("CCS"), seeking $381,290.00 in damages under the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 (1982 & Supp. III 1985). This litigation, although maintained by Haehn, has been conducted by CCS. Based on the parties' recommendations, discovery was to be concluded by May 30, 1987, but was extended upon defendant's

motion to July 29, 1987. *See* Order entered on June 19, 1987. Subsequently, defendant thrice requested additional time, further extending the discovery deadline to August 28, 1987; then to September 28, 1987; and then to October 16, 1987. *See* Orders entered on July 28, 1987; Aug. 25, 1987; and Sept. 18, 1987. A final extension to November 12, 1987, was granted to defendant over CCS' objection. *See* Order entered on Oct. 23, 1987. Defendant later informed the court that a witness, which it previously represented would be made available for deposition, could not attend during the week of November 8–16, 1987. By Order entered on November 9, 1987, defendant was directed to make its witness available on November 23, 1987, either at the office of CCS' counsel or in the capital of the state in which the witness resides. Trial had been scheduled to commence on December 7, 1987, by order entered on July 31, 1987. The enlargements of time requested by defendant after July 31, 1987, were allowed on the basis that the trial date would not be affected.

At the conclusion of trial, the court adopted a method of disposition approved by the Federal Circuit in *Under Sea Industries, Inc. v. Dacor Corp.*, 833 F.2d 1551, 1554 (Fed.Cir.1987). Essentially, the court issued oral findings pursuant to RUSCC 52(a) that "cover[ed] all the bases," 833 F.2d at 1554; ordered the prevailing party through CCS to submit findings of fact; and provided defendant an opportunity to submit responsive comments and objections. *See* Order entered on Dec. 14, 1987. Problems plagued this endeavor. First, the findings filed by CCS on behalf of itself and Haehn largely were ultimate findings of fact. After CCS filed adequate and reasonable findings, defendant obtained an extension to file its responsive pleading. The products of this extension were an unsolicited post-trial brief and findings that included some objections, but, for the most part, were proposed findings that ignored the strong findings based on credibility that the court had entered on the record. CCS has declined an opportunity to respond to what it referred to as "defendant's belat-ed post-trial brief." Plf's Br. filed May 13, 1988.

Defendant's submissions prevent the utilization of *Under Sea*, which initially had been appropriate since the cases the parties put forward by pretrial and trial revealed scant contest on the legal issues, and the disputed facts were resolvable by a bench ruling. Since defendant's post-trial filings go beyond what transpired earlier, the following findings supersede the bench ruling and draw upon the parties' submissions only as proposed findings and argument. Paragraph 4 of the order entered on December 14, 1987, accordingly, is vacated.

The court is sensitive that defense counsel entered the case two and one-half months before trial. However, defendant can no more avoid the consequences of failure to conduct its discovery within the time prior counsel requested than could a private firm that was required to transfer a case from one of its attorneys to another several months before trial and found that discovery commitments had not been honored.

## FACTS

In September 1983 the Department of the Navy, Naval Facilities Engineering Command (the "Navy"), awarded Contract No. N62474–83–C–2123 to Haehn for construction of "Special Project R2–82, Taxiway 13–31 Repairs at the Naval Air Station, Fallon, Nevada." (The site will be referred to as "Fallon.") The contract, including the specifications and drawings, was promulgated by the Government.

The contract work included sealing of new joints and cleaning and resealing of existing joints in the concrete pavement of the airfield. The particular requirements were set forth, respectively, in sections 02563 and 02564 of the contract. All the joint sealing work was performed by CCS. Section 02564 called for the use of a cold-applied liquid sealant material. Federal Specification SS–S–200D entitled "Sealing Compounds, Two–Component, Elastomeric, Polymer Type, Jet–Fuel–Resistant, Cold Applied" (July 23, 1969) (the "Specification" or "SS–S–200D") covered this materi-

al, specifying use of a certain type of material, a Type M (machine-dispensed) fast-curing, two-component, cold-applied liquid sealant conforming to the Specification.[1]

The Specification describes the material to be used. Per section 3.2.1, Component A (the curing agent) was to be a blend of plasticizers, curing agents, accelerators, gelling agents (thixotrope), and fillers complementing Component B. Per section 3.2.-2, Component B (the base resin) was to be a homogeneous mixture of polymer and filler with the option of added activators, plasticizers, gelling agent (thixotrope), pigments, and inert extenders in a system complementing Component A.

Section 3.4.1 of the Specification provided that "Type M sealant shall conform to the following requirements and conditions," among others: The mixing ratio of the sealant was to be, by volume, one part Component A to one part Component B plus or minus 5 percent variation, and the sealant had to attain a tack-free condition within three hours after application. Section 4.5 of the Specification prescribed a series of laboratory tests to which the proposed sealant material would be subjected and set forth procedures for conducting the numerous required tests. Eleven tests were specified to be performed, including tests for viscosity, tack-free time, accelerated aging, self-leveling, changes in weight and volume, resilience, artificial weathering, bond, flame-resistance, and flow.

Nine standards, corresponding to the tests, were specified in section 3.3 of the Specification. A significant number of these, under color of performance standards, were, in fact, particular physical properties of the proposed material, such as viscosity, resilience, and flame resistance. Their measurements were precise requirements of the Specification.

CCS selected Superior Products, Inc. ("Superior"), to supply the 200D joint sealant material for the project. A manufacturer of various joint sealant materials, Superior manufactured the 200D sealant used on this project under the trade name of "Superseal 200D" and identified as Production Lot No. 131. Superior manufactured a series of individual batches of both Component A and B material in separate vessels to make up Lot 131. Superior's vessel for mixing Component A had a capacity of 1,000 gallons, and its Component B vessel had a capacity of 427 gallons. The various ingredients in each vessel had to be blended and thoroughly mixed for one-half hour in the case of Component A and one-half to one hour for Component B in order to obtain the formulated product. When the mixing and blending of the batches in each vessel were completed, an initial one-hour sampling test was performed. Only then was the sealant material packaged in five-gallon pails.

The total volume of Superseal 200D material manufactured by Superior for Lot

1. Prior to trial defendant stipulated, as follows:

 7. Defendant specified that a cold-applied joint sealant material that met and conformed to the requirements of Federal Specification SS–S–200 D, Type M was to be used for the joint sealing work at issue in this suit.

Joint Memorandum Re Stipulations, filed Dec. 8, 1987. Indeed, Defendant's Pretrial Submission, filed Dec. 1, 1987, at 1, stated: "The contract required that cold-applied joint sealing material which met and conformed to the requirements of Federal Specification SS–S–200 D, Type M be used...." After trial defendant objected to CCS' finding that the Type M (fast-curing) joint sealant was required:

 4. In response to plaintiff's findings of fact in paragraph 4, defendant objects to the findings of fact by plaintiff as being misleading and self-serving. Defendant proposes the following finding of fact in the alternative: To accomplish the cold-applied joint sealing work, defendant required, through the contract specifications, that the contractor use a joint sealant composed of materials within parameters set by the specification and the manufacturer/contractor was given the freedom to formulate the joint sealant however the manufacturer/contractor desired as long as the joint sealant formulated by the manufacturer/contractor performed so as to pass the tests provided by the specification. The specification also required that the material be machine applied into the joints and have a curing time of not more than three hours.

Def's Proposed Finding of Facts, filed May 2, 1988, at 1–2 (citation omitted). This is hopeless quibbling: Type M sealant is what is specified. That Type M is described with particularity may be the implication defendant wants to avoid, but conceding the appropriate provision of the Specification was done before trial and it is not a matter that warrants revisiting.

131 was approximately 10,000 gallons of each component. Of that amount 1,000 gallons each of Component A and B were shipped to CCS for use on the subject project.

The contract specifications also required that samples of each batch of sealant be submitted to the Government for testing. Part 3.4.1 of contract section 025464 provided:

Sampling and Testing Joint Sealers: Joint sealers will be tested by the Government, and no material shall be used prior to receipt by the Contractor of written notice that the material is acceptable. The cost of the first test of samples from each lot of joint sealer will be borne by the Government. If the sample fails to meet specification requirements, the material represented by the sample shall be replaced. Sampling and testing new material, and any results of rejected material, shall be at the expense of the Contractor.

Pursuant to contract section 02563, part 1.2.2, as incorporated into section 02564, part 1.2.5, it was the contractor's responsibility to submit the samples of joint sealant for testing and approval prior to use on the project. These provisions instructed the contractor to submit a five-gallon sample of both Component A and B of the joint sealant to the U.S. Army testing facility at Vicksburg, Mississippi ("Vicksburg").

In accordance with the contract specifications, Superior in January 1984 submitted to the Vicksburg facility one five-gallon sample each of Superseal 200D, Lot 131, Component A and B material for testing. The Vicksburg facility conducted the tests required by the Specification and the samples submitted satisfied the requirements. In early April 1984, the Navy orally notified Haehn that the samples had passed the tests; that the contractor could use the Superseal 200D, Lot 131 material; and that the sealing work should proceed without awaiting receipt of the written test results.

CCS properly cleaned and prepared the cracks and joints to receive the new Superseal 200D material. The existent sealant in the cracks and joints was removed by a V-shaped cleaning tool referred to within the industry as a plow, with some hand removal. All of the cracks and joints were also cleaned by waterblasting and sandblasting; the joints were then widened by saw to expose the aggregate; and the joints were blown dry, to the greatest degree possible, prior to placement of any new material. The preparation work performed by CCS and Haehn was under the daily observation of the Navy's inspector, and any and all deficiencies noted by the inspector were remedied by CCS before placement of the new material. Prior to installation the Navy noticed that some joints were not prepared adequately. The problems with the joint preparation were unclean sidewalls, inadequate cutting of the joints, areas where roving (a rope-like material placed along the bottom of all joints) was too high or too low, and areas where roving was not placed in the joint. The contractor was instructed to correct these deficiencies. All deficiencies in the joint preparation were minor overall and were corrected by CCS in all instances.

The contract specifications also prescribed in detail the type of equipment and methods to be used by the contractor in the performance of the joint sealant work. The contract required that the type of joint sealant used on the contract be machine mixed and that the sealant be applied by machine. SS–S–200D hand-mixed and machine-mixed joint sealants are different types of sealants with different curing times. The machines used in the industry are basically the same with minor variations. CCS rented the machine used to install the Superseal 200D from Superior which complied with the functional requirements of the contract. Before and at the commencement of sealing operations, the manufacturer's representative assisted CCS in starting-up and testing the machine's operation to ensure that the equipment was operating correctly and that the required mixture of the two components was being obtained.

The actual application of the sealant into the joints was overseen personally by Richard T. Nixon, President of CCS, and four

laborers. One individual, designated as the operating engineer, had the responsibility of checking the flow and usage in the dispensing tanks of the application machine. The application machine was pulled by a tractor driven in low gear by another individual. A third individual walked in front of the wand-holder and blew out any dust or small debris immediately prior to placement of the sealant. The fourth individual, holding the applicator wand, walked backward and physically placed the material into the joint. Mr. Nixon, a very forthcoming, concerned contractor, who relished the opportunity to discuss his trade, also testified that he "just took tests and walked along behind the machine to make sure nothing blew into the joint ... check[ed] for tack-free condition and [made sure] that the joint was filled [correctly]." Hand placement of sealant, through the mixing of equal amounts of both components, was limited to isolated instances where, for example, two joints intersected and roving had floated or sealant had penetrated around the roving and seeped down creating a low spot. The use of the machine in applying these finishing touches would be impractical because starting and stopping the machine for small corrections along such an area could result in sealant setting up in the dispenser head.

The machine had two tanks: Component A material was placed in one and Component B in the other. The two components were pumped through hoses to a mixing head and then to a wand or nozzle from which the sealant was placed in the joints. CCS employed two methods to assure that the components were being mixed in the required relatively equal proportions. One method was to observe the level of material in each tank as it was being used to ensure that the rate of discharge of each component was essentially equal; and the other was periodically to take coffee-can size samples of the mixed material as it was discharged and mix equal portions to assure that the material reached a tack-free condition. According to Mr. Nixon, there was a 3–percent differential between the two components throughout the placement.

CCS applied the Superseal 200D material in two separate areas of the airfield in the spring of 1984. In mid-April the material was placed in the north phase of the project, and the south phase was applied in May. At the time of placement, the sealant appeared to be in a satisfactory condition except for some areas of low or excessive joint filling. Near the end of May, bubbling and reversion problems appeared in some places in the north end. At the Navy's direction, CCS, at its own expense, during the first two weeks of June corrected the bubbling and other minor deficiencies which appeared in the joint sealant work, and upon the completion of this work CCS left the project site.

Within a month's time, more bubbling and other deficiencies appeared in the sealant throughout the project area. The Navy determined that the sealant material was unsuitable and informed Haehn by letter of July 6, 1984, that the material would have to be replaced. The Superseal 200D installed by CCS exhibited lack of bonding, tackiness, variation in depth of the sealant, bubbles and blisters, exposed roving, very hard sealant, and uncured sealant. After its installation the Navy took samples of the Superseal 200D from Haehn's and CCS' stockpile at the Fallon site and sent these samples to Vicksburg for testing. The samples failed to cure after being mixed in the proper ratio, and no testing could be performed on the material. The condition of the Superseal 200D sealant that CCS installed required that the sealant be removed and replaced. The reasons the sealant failed to perform as expected by the Navy are unknown.[2]

In July and August 1984, the Navy instructed Haehn to remove and replace Superior's Superseal 200D that had been installed by CCS. Thereafter, Haehn, through CCS, under protest, removed and replaced all the Superseal 200D with a joint sealant product made by another manufacturer. The joint sealant replacement work ultimately was accepted by the Navy, and,

**2.** *See infra* note 5.

based on photographs displayed at trial, appears to be in the same poor condition as revealed in the photographs taken after the first installation failed. Plaintiff submitted its certified claim on January 10, 1985.

## DISCUSSION

 In the jurisprudence of public contracts, the Government is held to warrant to a contractor that if design plans and specifications are flawed, the contractor will not be liable for defective performance or products. *See generally Johns–Manville Corp. v. United States*, 13 Cl.Ct. 72, 119 (1987), *appeal docketed*, No. 88–1004 (Fed.Cir. Oct. 2, 1987). A claim based on defective specifications can only be maintained if the contract incorporates design rather than performance specifications. *See Dewey Electronics Corp. v. United States*, 803 F.2d 650, 658 (Fed.Cir.1986); *Ordnance Research, Inc. v. United States*, 221 Ct.Cl. 641, 670, 609 F.2d 462, 479 (1979). However, the designation of a specification as a design or performance type does not govern. *Zinger Constr. Co. v. United States*, 807 F.2d 979 (Fed.Cir. 1986). Design specifications "set forth in precise detail the materials to be employed and the manner in which the work ... [is] to be performed." *J.L. Simmons Co. v. United States*, 188 Ct.Cl. 684, 689, 412 F.2d 1360, 1362 (1969) (per curiam). These specifications permit no deviations. *Stuyvesant Dredging Co. v. United States*, 834 F.2d 1576, 1582 (Fed.Cir.1987). By contrast, performance specifications "set forth an objective or standard to be achieved, and the successful bidder is expected to exercise his ingenuity in achieving that objective or standard of performance, selecting the means and assuming a corresponding responsibility for that selection." *J.L. Simmons Co.*, 188 Ct.Cl. at 689, 412 F.2d at 1362; *see also USA Petroleum Corp. v. United States*, 821 F.2d 622, 627 (Fed.Cir. 1987).

 The warranty of specifications can be vitiated by the involvement of industry or the contractor's participation in the drafting and development of the specification absent superior knowledge on the part of the Government. *See Bethlehem Corp. v. United States*, 199 Ct.Cl. 247, 254, 462 F.2d 1400, 1404 (1972). However, other than the participation by Superior's President, Frank D. Gaus, in panel discussions during the development of the original SS–S–200 series specification, there is no evidence that Superior, CCS, or Haehn had any type of significant participation that could vitiate the warranty. *Cf. Johns–Manville Corp.*, 13 Cl.Ct. at 131–32. It was ruled in a case involving the interim and first specification for what is today the 200D sealant that the manufacturers' cooperation and advice in preparing that specification did not amount to a collaboration that vitiated the warranty. *Metal Bldg. Specialties Co.*, 1963 B.C.A. (CCH) ¶ 3,943, at 19,527.

 Defendant argues that Specification SS–S–200D is a performance specification. It is true that the Specification is a mixed design and performance type, as it includes both a compositional requirement and standards by which the joint sealant must perform. *See Johns–Manville*, 13 Cl.Ct. at 131. However, an analysis of the Specification and the testimony of both parties' witnesses establish that the Specification is dominantly of the design type in that it tightly circumscribes any latitude of the contractor in choosing a product that can achieve the standards of performance. *See id.* For example, section 3.2.1 specifying the Component A curing agent sets forth a performance standard: "Component A shall activate the polymer system to end-point when mixed homogeneously with component B in the ratio, curing time, and conditions, as specified herein for the applicable type...." Section 3.2.1 then goes on to prescribe the constituents of Component A, although not their precise formula. The properties of Components A and B when mixed together and their 1:1 ratio are detailed in section 3.4.1 of the Specification. As the trial court observed in *Stuyvesant*, detailed measurements, tolerances, and materials, *i.e.*, elaborate instructions as how to perform the contract, are of a design nature, in contrast to operational characteristics and specifications that leave the de-

tails of how to comply with the contract up to the contractor. *Stuyvesant Dredging Co. v. United States*, 11 Cl.Ct. 853, 860, *aff'd*, 834 F.2d 1576, 1582 (Fed.Cir.1987). Moreover, the Specification prescribed in detail both the type of equipment to be used and the methodology for performing the joint sealant work.

It has been noted that *Metal Building Specialties Co.*, 1963 B.C.A. (CCH) ¶ 3,943, dealt with a predecessor specification to SS–S–200D—SS–S–00200a, an interim specification. The case involved a contract for the cleaning and resealing of joints on aircraft aprons with a cold-applied sealant consisting of Components A and B, which satisfied Federal Specification SS–S–00200a. The *Metal Building* sealing work, like Superior's product, was rejected after the sealant failed to form a proper bond. Like the instant case, *Metal Building's* Specification 200a provided

rather elaborate instructions for performing a number of tests. It prescribes a compound consisting of two components: A base component consisting of a "jet-fuel-resistant elastomeric polymer modified with plasticizers, activators, and inert fillers"; and a curing agent consisting of a "blend of accelerators and extenders." Specification 220a required that the compound be "capable of being homogeneously mixed on-the-job to a consistency appropriate for pressure extrusion," and that "when mixed and applied in the field in accordance with the manufacturer's instructions, the mixture shall completely fill the joints without the formation of air holes (entrapped air) and discontinuities." (Spec. 200a, par. 3.1) The tests to be performed on the sample material are [sic] separately for pen-

etration, solubility, flow, bond, flame resistance, and resilience (Spec. 200a, pars. 3.2 through 3.7)....

1963 B.C.A. at 19,523. Many of these same tests are listed in the current version of Specification SS–S–200D. *See* SS–S–200D §§ 4.5.4.1—4.5.4.11 (July 23, 1969), *as amended* (Nov. 1, 1971) (detailing 11 tests, including penetration, solubility, flow, bond, flame resistance, resilience, and so forth). The tests "[did] not include a chemical analysis of the samples...." 1963 B.C.A. at 19,523.

In applying a theory of the warranty of specifications, the Armed Service Board of Contract Appeals (the "ASBCA") held "that the federal specification clearly implies that if a material which meets its criteria by passing its tests is applied properly, it will adequately perform the job for which it was intended...." 1963 B.C.A. at 19,528. This court, although not bound by *Metal Building* and recognizing that the case at bar involves an updated version of the same joint sealant specification, holds that the Specification constitutes a design, rather than performance, specification—not only because the Specification established rigorous tests for measuring performance, as the board reasoned in *Metal Building*, but also because the compositional requirements and tolerances displaced the contractor's discretion in selecting a formulation and because the machinery and methodology for performing the joint sealant work were set out in precise detail (in the case of the machinery, even illustrated).

Defendant seeks to confine *Metal Building* to an early experimental version of the joint sealant that was applied in a very humid environment during precipitation.[3]

---

**3.** The court notes that CCS did attempt to prove a water problem at the Fallon site, but the evidence on this point was inconclusive. To the degree that water was present on the airfield work area, the court finds that CCS was not at fault for the addition of water to the worksite, since the subject contract required waterblasting. *See* Contract No. N62474–83–C–2123, § 02564, part 2.2.2.5.

Additionally, both CCS and defendant attempted to prove that temperature played a role in the sealant's defective performance. Defendant's position was that CCS placed sealant when

the temperature was under or just over 40°F, although Superior's literature recommended placement above 50°F. CCS responded that it was ordered to place the material as soon as the temperature rose slightly above 40°F, that the Specification recommended this minimum placement temperature, and that CCS requested that placement be delayed to later in the day when the temperature rose to approximately 60°F. The court discounts both positions because not all placement was done in the morning; by noon the temperature was 60°F; and almost all of the material, regardless of location

The factors that were decisive to the ASBCA, on the contrary, were that the contract required use of a material complying with Specification 200a and that the numerous and detailed performance criteria were the measure of performance. Significantly, the board remarked both that although Specification 200a was an interim specification, the same material (if not the same lots) had been used successfully by other government contractors, *id.* at 19,-526, and that the moisture was not the cause of the failure of the compound—in fact, that neither the contractor nor the Government knew why the joint sealant failed to work. *Id.* at 19,528. The case at bar shares this similarity.

Defendant argues that two later board cases limit *Metal Building* to its facts. It is true that *Kollsman Instrument Corp.,* 65–1 B.C.A. (CCH) ¶ 4,531 (1964), referred to *Metal Building* as involving the Government's "preparation of a specification requiring the use of a novel compound," 65–1 B.C.A. at 21,741, but the contrast was made with drawings and specifications that prescribed in detail neither the bonding material nor the bonding method for a bonding process. *See id.* at 21,735, 21,739. In *Lyburn Construction Co.,* 65–1 B.C.A. ¶ 4,645 (1965), the board rejected the contractor's argument that Specification 200a was inadequate because it was found that the contractor's operators were inexperienced in placing the compound. 65–1 B.C.A. at 22,189–90. Here, CCS proved that its placement was not faulty. It is true that the board in *Lyburn* remarked that the "relatively new material" had proved itself on other projects when manufactured, tested, stored, and applied properly, *see id.* at 22,190, but the board made the same observation in imposing the warranty in *Metal Building. See* 1963 B.C.A. at 19,526. The point is that when a contractor complies fully with a design specification and related contractual provisions and the result inexplicably is unsatisfactory, a claim based on the warranty will lie.

Over CCS' objection that defendant had failed timely to raise an issue, defendant and time of placement, exhibited similar de-

was allowed to try the issue concerning whether the sealant samples, which were sent to the Government's Vicksburg facility for testing, properly represented the sealant lot utilized at Fallon. *See* Order entered on Dec. 3, 1987, ¶ B.4.

Specification SS–S–200D provides for two methods of sampling:

4.3.2.1 *Sampling under single-production-lot procedure.* Samples will be taken in accordance with 4.3.2.1.1. or 4.3.-2.1.2 for each 3,000 gallons (or fraction thereof) of each component of the sealant in a production lot.

. . . .

4.3.2.2. *Sampling batch—series production.* When the quantity of material necessary to fulfill the purchase order requirement is manufactured in several or a series of small batches (e.g., 150 to 500 gallons per component), representative samples will be taken from each batch of each component. Except as required, the samples from each batch shall consist of not less than 1 gallon of each component.

CCS' witness, Edwin C. Klabunde, Vice President and Plant Manager for Superior, testified that 1,000 gallons of Components A and B were generated in mixing vessels of different sizes. Although the manufacturing vessel for Component A had a capacity for 1,000 gallons, the Component B vessel had only a 427–gallon capacity. Mr. Klabunde also testified, and defendant does not dispute, that two five-gallon pails of Component A and B respectively, were delivered to Vicksburg for testing. Defendant therefore argues that the sampling was incorrect since more than one 427–gallon capacity vessel of Component B had to be utilized in order to produce 1,000 gallons.

The issue raised by defendant concerns what constitutes a "lot" of sealant. Section 4.3.1 of Specification SS–S–200D under the heading "Lot" states: "A lot shall consist of the sealant manufactured in one batch of base material and in one batch of curing agent, *or from batch-identified constituents when formulated under continuous flow process and offered for de-* fects.

*livery by the contracting formulator."* (Emphasis added.) CCS proved at trial through the testimony of Mr. Gaus, Superior's President, that Lot 131, the production run from which CCS received its sealant, consisted of 10,000 gallons total. Lot 131 was manufactured from the same inventory of raw materials, by the same crew, under the same formulation by making batch after batch over a ten-day to two-week period.

Defendant argues that logic and Webster's Dictionary dictate that "continuous flow" means without interruption. Defendant further contends that a manufacturing process that is stopped and restarted over a period of several days does not constitute a continuous flow. According to defendant, rather than one five-gallon pail of Component B, three sample pails or a homogenous mixture pail from all three batches were required to satisfy the sampling requirements and thereby entitle Haehn and CCS to rely on the warranty of specifications.

 Contract language should be given its plain meaning without rewriting or varying terms of the contract. *See Hyman Constr. Co. v. United States,* 832 F.2d 574, 581 (Fed.Cir.1987); *Julius Goldman's Egg City v. United States,* 697 F.2d 1051, 1057 (Fed.Cir.), *cert. denied,* 464 U.S. 814, 104 S.Ct. 68, 78 L.Ed.2d 83 (1983). However, trade usage and custom can be applied to an undefined contract term. *Moore v. United States,* 196 U.S. 157, 166, 25 S.Ct. 202, 203–04, 49 L.Ed. 428 (1905); *Northwestern Indus. Piping, Inc. v. United States,* 199 Ct.Cl. 540, 550–51, 467 F.2d 1308, 1314 (1972); *W.G. Cornell Co. v. United States,* 179 Ct.Cl. 651, 669–71, 376 F.2d 299, 311 (1967). Defendant's position regarding what constitutes continuous flow seems perfectly logical in every scenario except the sealant business. Mr. Gaus, an individual who has been in the business of manufacturing sealant for over 31 years and whom the court found to be a most credible witness, testified that there is no way in which the Component B sealant could be manufactured under defendant's

scenario. Under the direction of CCS' counsel, Mr. Gaus described the problem:

Q. Is it—is it possible, physically possible, to run the mixers so that as you mix a batch, before you poured out the contents of that batch, that you keep pouring in more of the mix?

A. No.

Q. What would happen if you tried to do that?

A. Well, you wouldn't have anything because it would be adulterated.

Q. In other words, the mix would be defective?

A. It would not be according to the formulation.

Mr. Gaus, the only witness to be qualified as an expert, further testified that no manufacturer has a mixing vessel of 5,000 or 10,000 gallons and that continuous flow means that the "same [identified] raw materials were used in each batch to make a lot and [that the] same crew, [and] same formulation [were all] identical."

Defendant pressed two of its witnesses, Daniel S. Haynosch, Director of Construction Management for the Western Division of the Naval Facilities Engineering Command, and Lenford N. Godwin, Supervisory Civil Engineer, Waterways Experiment Station, Vicksburg, Mississippi, to define "continuous flow." Mr. Haynosch admitted having no personal knowledge of nor having ever studied the manufacturing process of joint sealants as specified by SS–S–200D. Additionally, Mr. Haynosch has never participated in any of the testing procedures set forth in the Specification. Mr. Haynosch testified that continuous flow would be achieved if the supplier was "constantly mixing and pouring and used these ingredients that he purchased all at the same time from certain suppliers ... [with] the same people, the same operation." He further opined that only material produced by an eight-hour shift would be a lot because any interruption and re-starting might involve "a new set of circumstances.... [E]quipment would have to be cleaned, possibly a [sic] different personnel [would be] involved." The unchallenged testimony of Mr. Klabunde who stated that

the same crew, materials, and formulation were used each day suggests that some of Mr. Haynosch's hypothetical concerns were not present.

Mr. Godwin, equally unqualified in the manufacturing process except as he has participated in the Government's testing procedures for the 200D sealant, reasoned on the basis of two analogies. The first dealt with Coca Cola bottles moving on a conveyor belt with a machine dispensing soda into the containers; and the second involved asphalt in which base constituents would be added continually into the top of a vat with the finished product continuously flowing from the other end. These analogies are found to be invalid based on the sophisticated chemical reaction process that inheres in the manufacturing process for the joint sealant called for by the Specification. As Mr. Gaus explained, the mixing process must run for at least an hour before any dispensing takes place. In any case, the material is not immediately dispensed into pails. After mixing is complete, a small sample is taken to the laboratory for testing which is not completed for yet another 30 minutes to one hour. Only after this initial testing is satisfied is the material dispensed from the manufacturing vessel into storage pails. Only then can more of the segregated raw materials be placed into the vessel to produce another batch.

The court finds and concludes, based upon the unrefuted testimony of CCS' expert Mr. Gaus, that the definition of what .constitutes a lot means utilizing a specific identified group of raw materials mixed batch after batch by the same crew using the same formulation. The concept does not bear the absurd implication that the product must continuously flow from the manufacturing vessel with a constant addition of materials, 24 hours a day, without interruption. The interpretation adopted by the court is based on industry custom with respect to an otherwise undefined contract term and does not vary or conflict with other provisions in the contract. *See Hyman Construction*, 832 F.2d at 581.

■ Defendant also argues that the contract requires more than one five-gallon sample of both components. Although section 4.3.2.1 of the Specification states that samples must be taken "for each 3,000 gallons (or fraction thereof) of each component of sealant in a production lot" and Superior did manufacture and produce 10,-000 gallons of each component for Lot 131, only 1,000 gallons of both components were shipped to Fallon. The Specification goes on to state:

In cases where the quantity purchased is less than the normal production-lot quantity for that producer, only one production lot shall be offered for sampling to fulfill the purchase order requirement. A 5–gallon pail sample for each production lot of each component shall be taken by random selection.

Specification § 4.3.2.1.2. The Navy bought less than the 10,000–gallon production lot, and a test sample was selected at random. Reading both provisions together and affording each its full meaning, the Vicksburg facility would receive multiple samples only if the entire production lot or a fraction of a lot exceeding 3,000 gallons were purchased.

■ The contractor bears the burden of proving the amount of its damages " 'with sufficient certainty so that the determination of damages will be more than mere speculation.' " *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 767 (Fed.Cir. 1987) (quoting *Willems Indus., Inc. v. United States*, 155 Ct.Cl. 360, 376, 295 F.2d 822, 831 (1961), *cert. denied*, 370 U.S. 903, 82 S.Ct. 1249, 8 L.Ed.2d 400 (1962)). Since an equitable adjustment is sought, this requirement applies to proof of CCS' and Haehn's increased costs. *William Green Constr. Co. v. United States*, 201 Ct.Cl. 616, 629, 477 F.2d 930, 938 (1973), *cert. denied*, 417 U.S. 909, 94 S.Ct. 2606, 41 L.Ed.2d 213 (1974).

■ CCS and Haehn individually put on their damages cases, and the court questioned the witnesses when defendant did not. The court inquired to ascertain that CCS and Haehn had made available to defendant before trial the pertinent documen-

tation to support their damages claims. Defendant's post-trial submissions do not address the parties' proof on increased costs (other than to say that the evidence does not support the claims) or raise any impediments of law as to the type or measure sought.

CCS demonstrated at trial by a preponderance of admissible evidence that it is entitled to an equitable adjustment in the amount of $214,290.00, as itemized and explained in PX 48 and justified by Mr. Nixon's testimony. It should be noted that an internal government estimate of CCS' claim calculated costs of $227,004.00.

Against its claim of $143,524.00, Haehn offered evidence to support an award of $21,823.00 based (1) on the Government's estimate; (2) the daily reports substantiating CCS' and Haehn's efforts at the site during the rework; and (3) CCS' proof of the nature, extent, and duration of the rework. The court discounted the testimony of Haehn's damages witness as not credible for reasons stated on the record, but found that Haehn proved that it furnished supervisory support to CCS (one superintendent) and clean-up services. The court roughly recomputed Haehn's recovery for its own performance of work based on the three types of evidence discussed above at $41,309.00, in contrast to the Government's internal estimate itemized in PX 71 of $21,823.00 for the same elements. The Government's estimate is taken as the more reliable figure in that Haehn's witness and the other evidence provided insufficient support to justify a higher award. To the $21,823.00 amount reflected in PX 71 are added 5 percent for prime contractor overhead on the subcontractor work ($10,714.50), 6 percent for prime contractor profit ($14,809.65), and .5 percent for the prime contractor's bond premium ($1,308.19), for a total cost of $262,945.34,

$214,290.00 of which is attributable to CCS and the balance, or $48,655.34, to Haehn.

History repeats itself, or at least it has in this case. The SS–S–200 series of joint sealant which was held to be a design specification in its earlier developmental version by another forum is before this court in its more refined and even more detailed form. This Specification now provides even more detailed testing requirements. Proper samples were submitted by the contractor for testing and this tested sealant product was approved by the Government. CCS and Haehn proved at trial that this approved material was properly tested and applied, and any placement defects were corrected under the purview of government inspectors.

Defendant continuously has sought to reinforce its position by arguing that various versions of this Specification have been in existence for over 20 years. However, as Mr. Gaus, a 30–year veteran manufacturer of all types of sealants, testified, "[T]here's been no 200 D used by any commercial airport for many years...." Mr. Gaus also testified that the material that was used on the airfield previously was a different Superior Products brand, Superseal 777, which he explained was "much more resistant to everything whether it's hot or cold." In fact, this older Superseal 777, which in the past had been allowed as "or equal" to 200D, is still in place and functioning on the outside lanes of Fallon.[4]

Although the reason for the product's failure is unclear, CCS and Haehn followed the Specification and other contractual requirements and need not prove more to rely on the warranty of defective specifications.[5]

### CONCLUSION

It is found and concluded that Haehn is entitled to an equitable adjustment in the

4. Flame resistance in Specification 200D was particularly delineative, since this requirement prevented the qualification of Superseal 777, a product known to be superior, under this Specification.

5. For example, it has been found that samples of Superior's sealant taken by the Navy after the

reseal work had been completed did not set up such that they could be retested. This fact does not disturb the crucial facts that CCS' samples passed the Government's tests before work began and that the Navy did not halt CCS' work to attempt a retest or otherwise retest the material before completion.

total amount of $262,945.34, of which $214,-290.00, plus interest, is attributable to CCS and $48,655.34, plus interest, to Haehn. The Clerk of the Court shall enter judgment for Haehn in the amount of $262,-945.34, pursuant to the Contract Disputes Act of 1978, 41 U.S.C. § 611 (1982), from January 10, 1985. In entering judgment, the Clerk shall note that of the total award the sum of $214,290.00, together with interest thereon, is due Haehn on account of and for the benefit of its subcontractor CCS Construction Co., Inc.

IT IS SO ORDERED.