932 P.2d 1350

WILLAMETTE CRUSHING COMPANY, dba Wildish Southwest Construction Company, an Oregon corporation, Plaintiff–Appellant,

v.

The STATE of Arizona, By and Through the DEPARTMENT OF TRANSPORTATION; Daniel, Mann, Johnson & Mendenhall, a California corporation; and Jack E. Leisch and Associates, Defendants–Appellees.

No. 1 CA–CV 95–0491.

Court of Appeals of Arizona, Division 1, Department D.

Jan. 28, 1997.

Reconsideration Denied March 12, 1997.

**80**

Hershner, Hunter, Moulton, Andrews & Neill by William R. Turnbow, Eugene, OR, and Lewis and Roca, L.L.P. by David J. Cantelme and John P. Frank, Phoenix, for Plaintiff–Appellant.

Grant Woods, Attorney General by Joe Acosta, Jr. and Diane M. Miller, Assistant Attorneys General, Phoenix, for Defendant–Appellee.

Horne, Kaplan & Bistrow, P.C. by Thomas C. Horne and Martha B. Kaplan, Phoenix, for Defendant–Appellee Daniel, Mann, Johnson and Mendenhall.

Hanson, Bridgett, Marcus, Vlahos & Rudy by Howard W. Ashcraft, Jr., San Francisco, CA, and Jennings, Strouss & Salmon, P.L.C. by Michael Flood, Phoenix, for Defendant–Appellee Jack E. Leisch and Associates.

## OPINION

NOYES, Acting Presiding Judge.

Appellant Wildish made the low bid on an Arizona highway construction project which was to be completed within 360 working days and was to be staged according to a specified Traffic Control Pattern ("TCP"). After being awarded the contract, Wildish decided that it could not meet the due date using the State's TCP. Wildish asked for more time and the State refused. Wildish asked to use its own TCP and the State agreed. Using its own TCP, Wildish met the due date—with a cost overrun it now seeks to recover from the State and the engineers who drafted the State's TCP.

Wildish argues that the contract due date was a warranty by the State that a contractor could meet the due date using the State's TCP. Wildish also argues that the State's TCP was defective because no contractor could use it and meet the due date. The defendants argue that the State's TCP was not defective and that any due-date warranty was by Wildish because a contractor's bid is a warranty by the contractor that it can meet the due date if awarded the contract. The trial court granted summary judgment to defendants and we affirm. To do otherwise on the undisputed material facts presented would erroneously suggest that the law might imply a warranty of profitability in public contracts.

### I.

In April 1990 the Arizona Department of Transportation ("the State") invited bids on a project to expand "the Broadway Curve," a three-mile section of Interstate 10 in the Phoenix–Tempe area. The contract contained a TCP which specified the stages of construction and was intended to permit maximum traffic flow while ensuring the safety of motorists and construction workers. The contract specified completion of the project in 360 working days. Section 108.08 of the contract provided that "the contractor's plea that insufficient time was specified is not a valid reason for extension of time."

Wildish had nine and a half weeks to study the bid package. After one of its employees spent four weeks preparing its bid, Wildish submitted a bid of $22.1 million. This bid was $2.6 to $3.1 million lower than the State's cost estimate ($24.7 million) and the bids of all Arizona-based competitors: FNF Construction, Inc. ($24.8 million), The Tanner Companies ($25 million), and Pulice Construction ($25.2 million). There were also bids from two out-of-state companies: one was $15,000 higher than the Wildish bid and the other was $3.8 million higher.

After being awarded the contract, Wildish performed a critical path method ("CPM") analysis, which organizes and schedules a complex project such as this one. A CPM analysis is time-consuming and expensive and is not normally done prior to bidding on a contract. Based on its CPM analysis,

Wildish calculated it would need 542 working days to complete the project using the State's TCP. Wildish asked for an extension of the due date and the State refused, but the State did approve a TCP devised by Wildish.

Using its own TCP, Wildish completed the project in 357 days, but at a cost which exceeded its bid by $2.9 million. Wildish blamed the cost overrun on inefficiencies inherent in the TCP it had to devise in order to meet the due date. Wildish filed a claim with the State for the cost overrun and the claim was rejected. Wildish filed this lawsuit and the defendants were granted summary judgment. Wildish appealed. We have jurisdiction pursuant to A.R.S. sections 12–2101(B) (1994) and 12–120.21(A)(1) (1992).

## II.

Summary judgment is appropriate when there are no genuine issues of material fact. *Orme School v. Reeves*, 166 Ariz. 301, 310, 802 P.2d 1000, 1009 (1990). If the undisputed facts are such that no reasonable jury could grant relief, summary judgment is warranted. *See id.* Contract interpretation is a question of law which we review de novo. *Arizona Biltmore Estates Assoc. v. Tezak*, 177 Ariz. 447, 448, 868 P.2d 1030, 1031 (App. 1993).

This appeal involves a public contract and issues on which there are no Arizona cases. For guidance, we look to the federal court of claims and the federal boards of contract appeals, for those specialty courts have expertise with public contracts. *New Pueblo Constructors, Inc. v. State*, 144 Ariz. 95, 101, 696 P.2d 185, 191 (1985).

## III.

■ The contract entitles Wildish to a price adjustment if the State expressly or impliedly ordered modifications which "significantly changed the character of the work." Wildish argues that the State impliedly ordered modification of the TCP when it refused to extend the due date to enable Wildish to complete the contract using the State's TCP.

■ Change provisions compensate contractors for burdens not contemplated by the contract. *Wunderlich Contracting Co. v. United States*, 173 Ct.Cl. 180, 351 F.2d 956, 965–66 (1965). To qualify for adjustment under a change provision, a contractor must prove, first, that "any increased costs arose from conditions differing materially from those indicated in the bid documents;" and, second, that the changes "were reasonably unforeseeable in the light of all the information available to the contractor." *Sterling Millwrights, Inc. v. United States*, 26 Cl.Ct. 49, 72 (1992).

■ Wildish claims that the State's TCP had a hidden defect because only after being awarded the contract and performing its CPM did Wildish discover that it could not meet the due date using the State's TCP. Wildish's opening brief advises that, "Wildish calculated its bid assuming that the State's [TCP sequences] were appropriate for the job and, if followed, would allow the work to be completed within the time allowed." We conclude that the contractor bears the risk of basing a bid on such assumptions.

Wildish relies on a line of cases beginning with *United States v. Spearin*, 248 U.S. 132, 136, 39 S.Ct. 59, 61, 63 L.Ed. 166 (1918), which hold that, when the government specifies how the work is to be done, it impliedly warrants that adherence to the specifications will result in "satisfactory completion of the work." *John McShain, Inc. v. United States*, 188 Ct.Cl. 830, 412 F.2d 1281, 1283 (1969); *see also Chaney Bldg. Co. v. City of Tucson*, 148 Ariz. 571, 574, 716 P.2d 28, 31 (1986).

■ The *Spearin* rule applies to design specifications only; it does not apply to performance specifications. *Haehn Management Co. v. United States*, 15 Cl.Ct. 50, 56 (1988). Design specifications precisely detail the manner in which the work is to be done. *J.L. Simmons Co. v. United States*, 188 Ct. Cl. 684, 412 F.2d 1360, 1362 (1969). Performance specifications set forth an objective and allow the contractor to determine how to achieve it. *Haehn*, 15 Cl.Ct. at 56. The only warranty implied in design specifications is that "the product shown can be made in the manner shown." *Natus Corp. v. United*

*States,* 178 Ct.Cl. 1, 371 F.2d 450, 455 (1967). This warranty is implied only in design specifications which are inflexible. *See J.L. Simmons,* 412 F.2d at 1362; *see also Haehn,* 15 Cl.Ct. at 56 ("These [design] specifications permit no deviations.").

For three reasons, Wildish cannot possibly prove that the State's TCP was a breach of the warranty implied in design specifications: First, although Wildish complained about the time it would take using the State's TCP, it is undisputed that Wildish could have constructed the project using the State's TCP. Second, it is undisputed that Wildish was permitted to deviate from the State's TCP and use its own. Third, the *Spearin* rule requires something akin to a hidden physical defect in the design specifications. The State's TCP had no such defect.

In *Spearin,* the contractor was to build a dry dock "in accordance with plans and specifications which had been prepared by the government." 248 U.S. at 133, 39 S.Ct. at 60. The specifications showed a 7–foot–diameter sewer line, but they failed to show that the line was obstructed by an interior 5–foot–high dam. *Id.* at 134, 39 S.Ct. at 60. The hidden dam was discovered after the sewer backed up and flooded the jobsite. Each party claimed that the other should pay to correct the sewer-line problem. *Id.* at 135, 39 S.Ct. at 60–61. The Supreme Court assigned responsibility to the government, whose design specifications erroneously showed that the sewer line was adequate:

> The general rules of law applicable to these facts are well settled. Where one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation, because unforeseen difficulties are encountered.... But if the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications.... [T]he contractor should be relieved, if he was misled by erroneous statements in the specifications. ... [T]he insertion [in the plans] of the articles prescribing the character, dimensions and location of the sewer imported a

warranty that if the specifications were complied with, the sewer would be adequate.

*Id.* at 135–37, 39 S.Ct. at 61 (citations omitted). All *Spearin*-rule cases we have found involve design specifications which misled the contractor regarding some physical condition relevant to the job and the bid. We discuss a few such cases. The contractor in *J.D. Hedin Construction Co. v. United States* was to build a hospital complex. 171 Ct.Cl. 70, 347 F.2d 235, 239 (1965). The design specifications called for thin-shelled piles in some areas and spread footings in others. *Id.* at 241–42, 248. After beginning work, the contractor found that the design specifications misrepresented the density of the subsoil and the location of the gravel stratum and, therefore, that the job required more-costly piles and foundations than were specified. *Id.* at 243, 249. There was also a problem with sewers: the subsoil was other than as specified, and inadequate to support the type of line specified. *Id.* at 250. Because the problems were caused by the government's defective design specifications, the contractor obtained delay-damages. *Id.* at 241, 252.

In *Laburnum Construction Corp. v. United States,* 163 Ct.Cl. 339, 325 F.2d 451 (1963), the contract provided specifications for 10,000 feet of 16–inch steam line, to be elevated on a specified type of concrete pedestal in most areas and to run underground in others. *Id.* 325 F.2d at 452. After beginning work, "it became evident that errors abounded" in the specifications. *Id.* at 453. The amount of line specified was eighty-four feet less than necessary, the line ran through a swamp in which the specified pilings could not be used, the specified pilings could not be used in other areas because of obstructions such as buildings, roads, and high tension wire, and the design of the "supports for a double action expansion joint in the pipeline" was faulty and caused the joint to fail. *Id.* at 453–55. The contractor obtained relief for increased costs attributable to the government's defective design specifications. *Id.* at 457, 459. The State's TCP had no such hidden defects.

 Wildish was tightly circumscribed by the contract due date, but the due date is

not a design specification; it is a performance specification. There is a well-accepted general rule for these kinds of cases. The trial court found, and we agree, that the applicable rule is found in *American Ship Building v. United States*, 228 Ct.Cl. 220, 654 F.2d 75 (1981), which holds that a due date in a public contract is not a warranty by the government; it is a warranty by the bidding contractor that, if awarded the contract, it can do the work in the specified time. *Id.* 654 F.2d at 78.

*American Ship* involved a ship-building contract with a due date of 900 days. The contractor ran into numerous problems and delivered the ship 511 days late, then sued to recover its losses. *Id.* 654 F.2d at 77–78. The contractor alleged that the due date was a warranty by the government that the contract could be completed in 900 days. *Id.* at 76–78. The trial court agreed, and it found that the government had breached the contract by failing to disclose that this was the fourth ship of this type built and—as the government knew but the contractor did not—the first was delivered 354 days late, the second took 1,374 days to build and was 689 days late, and the third took 1,492 days to build and was 848 days late. *Id.* at 77. Even so, the court of claims reversed the trial court and held that the due date was not a warranty by the government; it was a warranty by the contractor:

> A due date can be characterized as a contract requirement establishing when performance by the contractor must be completed. By entering into the contract, the contractor warrants it can perform by the due date. . . . By finding that the 900 days was a warranty, the trial judge transposed the situation and made the government a warrantor. . . . For a warranty to exist there must be either an affirmation of fact or a promise which relates to the performance under the contract. . . . In evaluating the actions of the parties in this case . . . we find it beyond 'the realm of expectation' that the government either expressly or impliedly warranted the contract could be performed within 900 days. Rather it invited those who thought they could deliver in 900 days to submit bids. We hold therefore, the 900 day require-ment was not a warranty of affirmation but a mere due date.

*Id.* at 78–79 (citations omitted).

Central to the holding in *American Ship* was the notion that the contractor, not the government, is the party in the best position to estimate the contractor's performance capabilities:

> One expects a contractor would examine the specifications provided to determine the complexity of the contract and make inquiries where necessary in light of its own capabilities. The contractor would then make a business judgment in deciding whether it could complete the contract by the due date. How long it takes to perform a contract is a function of the specification requirements and the contractor's capabilities. The bidder knows or should know both before bidding, but the government knows but one . . . .

*Id.* at 78.

As a matter of law, the contract due date was not the State's warranty that Wildish could perform on time. As a matter of fact, Wildish could and did perform on time, but without profit at the price it bid.

## IV.

■ Wildish claims entitlement to relief, or at least to a trial, on a doctrine it refers to as commercial "impossibility or impracticability." The standard applicable to this claim is whether performance was objectively unreasonable, i.e., whether "the industry as a whole found the specifications impossible." *Oak Adec, Inc. v. United States*, 24 Cl.Ct. 502, 504 (1991) (citations omitted). Completion of the job must require so much beyond the parties' contemplation that it becomes an exercise in commercial futility. *Appeal of Guy F. Atkinson Co.*, 88–2 BCA ¶ 20,714, 104,664, 104,675, 1988 WL 52450 (1988).

The parties submitted conflicting affidavits on this issue. Wildish submitted an affidavit in which the employee who prepared Wildish's bid swore that, in his opinion, no contractor could complete the project in 360 days using the State's TCP. Defendants submitted one affidavit from a retained expert

and another from a competitor Wildish underbid by $2.7 million: Each of these affiants swore that the job could have been done in 360 days using the State's TCP. The competitor's affidavit, from the man who prepared the bid for FNF Construction, Inc., stated that:

3. We estimated the project on a phase-by-phase basis. Based on the 12 man-weeks of work that we did, I am certain that 360 working days was adequate time to accomplish the work according to the original phasing appearing in the bid package.

4. As a participant in the Arizona highway construction industry for 25 years, I would not have expected to obtain an extension of time based on the claim that not enough time was allowed to complete the work as specified in the subject contract.

We agree that the trial court correctly decided the "commercial impracticability" issue as a matter of law. The Wildish affidavit is immaterial in light of the following undisputed material facts: First, Wildish's cost overrun of $2.9 million plus its bid of $22.1 million amounts to a total of $25 million, which is in the range of the State's estimate for the job and the bids of all but one of Wildish's competitors. Second, Wildish was allowed to vary from the State's TCP. Third, Wildish met the due date. On such undisputed facts, Wildish cannot possibly meet the objective standard required to obtain relief on a commercial impossibility or impracticability theory.

Wildish argues that "time impossibility" can support a claim for commercial impracticability. It relies on three cases: *Tombigbee Constructors v. United States*, 190 Ct.Cl. 615, 420 F.2d 1037, 1049 (1970); *Robert E. Moore Constr.*, 90–2 BCA ¶ 22,803, 114,513, 114,526, 1990 WL 57479 (1990); and *Atkinson*, 88–2 BCA ¶ 20,714, at 104,675. But these cases are not *American Ship*-type performance specification cases; they are *Spearin*-type cases in which the design specifications tightly circumscribed the contractor and misled it regarding some physical condition relevant to the job and the bid.

The *Atkinson* specifications required concrete aggregate with an initial stabilized free moisture content of no greater than five percent. *Atkinson*, 88–2 BCA ¶ 20,714 at 104,-674. The project was to be completed in three years but the contractor soon learned that, because of existing weather conditions, it would take six years to achieve the specified moisture content using standard construction methods. *Id.* at 104,675. Although the government, at first, approved the contractor's use of standard construction methods and relaxed the moisture content specification, it later insisted that the contractor try to meet the specification by building underdrains and a shed, an extraordinary method and expense not contemplated by the parties. *Id.* at 104,676. The court allowed the contractor to recover its extra costs. *Id.*

The *Tombigbee* contract specified that the subgrade of an airport taxiway was to be compacted to a density of ninety-five percent. *Tombigbee*, 420 F.2d at 1048. The contractor ran into problems because unanticipated local soil conditions made it "impossible for practical purposes" to achieve the specified compaction and meet the performance deadline. *Id.* at 1048–49. The government refused to relax its specification and the contractor achieved the specified compaction with "great effort and the use of a variety of special equipment." *Id.* at 1048. The contractor was compensated for those extraordinary costs. *Id.*

The *Moore* contract involved production and delivery of concrete toilet buildings. *Moore*, 90–2 BCA ¶ 22,803, 114,513, 114,514. At trial, the government admitted that the plans were "tricky," and that only three firms in the country "were capable of providing the concrete forms necessary to construct the toilet." *Id.* at 114,526. All three firms tried to build these toilets using the government's design specifications, and all three had major problems: The first contractor found that the specifications "gave the appearance of a simple job," but, in reality, "[t]here was no simple way to meet the dimensional requirements and remove the forms after the concrete had set." *Id.* The second contractor was the appellant, whose contract was terminated by the government. The third contractor stepped in after appellant was terminated and found that, although

the contract called for delivery in 120 days, the design specifications were so defective that it required "six or seven months of experimentation and considerable cost to get the forms correct." *Id.* The court found that the government "should have changed the specifications ... or warned bidders." *Id.* at 114,527. The court granted relief to appellant on three grounds: the government waived the delivery schedule, it wrongfully rejected the toilets and its specifications were defective. *Id.*

Because the State's TCP contained no hidden physical defects and because Wildish did not have to use the State's TCP, the above-discussed cases are not helpful to Wildish. The trial court did not err in finding no genuine issue of material fact and in concluding that defendants were entitled to judgment as a matter of law.

## V.

The judgments are affirmed. The State is awarded attorneys' fees on appeal pursuant to A.R.S. section 12–341.01(A) (1992). All defendants are awarded costs as provided by law.

WEISBERG and GRANT, JJ., concur.