Filed 1/7/19

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| BERKELEY CEMENT, INC., <br><br> Plaintiff, Cross-defendant and Appellant, <br><br> v. <br><br> REGENTS OF THE UNIVERSITY OF CALIFORNIA, <br><br> Defendant, Cross-complainant and Respondent. | F073455, F073586 <br><br> (Super. Ct. No. CV002452) <br><br><br> **OPINION** |

APPEAL from a judgment of the Superior Court of Merced County.  Ronald W. Hansen, Judge.

Hampton Firm and Kyle A. Hampton for Plaintiff, Cross-defendant and Appellant.

Ralls Gruber & Niece, John W. Ralls, W. Samuel Niece and Anita W. Chu for Defendant, Cross-complainant and Respondent.

-ooOoo-

Plaintiff Berkeley Cement, Inc. (Berkeley) appeals from the judgment entered against it after a jury trial in this dispute over construction of a building on the Merced campus of the University of California.  Berkeley contends the jury's findings on the

---

[*]    Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I, II, III, IV and V(A).

complaint and on the cross-complaint were fatally inconsistent; the trial court incorrectly instructed the jury that a particular specification in the parties' contract was a performance specification, rather than a design specification, based on an incorrect interpretation of the contract; the trial court improperly cut off plaintiff's cross-examination of a key witness before it was complete; the trial court improperly excluded relevant evidence on the issue of damages after holding a hearing on its admissibility; and the trial court erred in including expert witness fees and mediation fees in its award of costs to defendant. We conclude the expert witness fees were improperly included in the award of costs, but no other error in the judgment has been demonstrated. We modify the judgment to exclude the award of expert fees and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant Regents of the University of California (University) requested bids for construction of a social sciences and management building (SSMB) on University's Merced campus. Berkeley submitted the low bid for the structural concrete work and was granted the contract. To create an attractive, energy efficient, and long-lasting structure, the plans and specifications called for a cast-in-place concrete building. Because the building was designed with architecturally exposed concrete, that is, areas exposed to view where the concrete itself was the finished surface of the building, the design specifications required a high quality concrete finish. They required the use of self-consolidating concrete in the architecturally exposed elements. They specified the aggregate (rock) to be used in the concrete in order to achieve a consistent color, and set a standard requiring minimization of the "bug holes" (voids in the concrete surface created by air pockets) in the architectural concrete.

When self-consolidating concrete was used to construct walls and columns, the construction required erection of formwork into which the concrete was poured. The contract documents required Berkeley to prepare mock-ups prior to pouring the walls and columns in place, to "permit verification of workmanship and visual qualities of the final

2.

completed installation." The architectural finish of the concrete was affected by the concrete mix, the formwork, and the placement of the concrete in the formwork.

Problems arose, delaying Berkeley's performance. The aggregate specified in the contract documents was not immediately available, and Berkeley used a substitute, which was later approved by University. Mock-ups were rejected by University; the concrete in the mock-ups exhibited bug holes excessive in quantity and size, rock pockets, discoloration, striations or "tiger striping," and honeycombing. Berkeley also experienced formwork "blowouts," where the formwork broke and the wall had to be redone. There was evidence the formwork Berkeley rented from its initial supplier was not designed for the pressures exerted by the self-consolidating concrete, which were higher than those exerted on formwork by conventional concrete.

Because of these and other difficulties, the concrete work fell behind schedule. Eventually, Berkeley engaged a subcontractor to provide and install formwork, in lieu of the rented and self-installed formwork it used initially. Additionally, University permitted Berkeley to complete the project using flowable conventional concrete, with which Berkeley was more familiar, instead of the self-consolidating concrete called for in the contract. Construction of the building was completed, and University paid Berkeley the full contract price for its work.

Berkeley submitted a Claim for Equitable Adjustment against University, seeking compensation for work it performed, which it claimed was extra work outside the contract. University denied the claim. Berkeley filed this action, alleging causes of action for breach of contract, breach of the implied covenant of good faith and fair dealing, and breach of the implied covenant of the correctness of the plans and specifications. It sought to recover compensation for alleged extra work and delays in construction, which it blamed on defective specifications for the concrete mix and University's alleged interference with Berkeley's performance by improperly rejecting its proposed concrete mix design, shop drawings, and mockups. University cross-

3.

complained against Berkeley for breach of contract, alleging the architectural concrete finish of the building did not meet the contract standards for uniformity of color and lack of bug holes, and Berkeley did not perform within the contract time, causing University to incur additional expenses.

After a lengthy jury trial, the jury found University did not breach the contract or either of the implied covenants; on the cross-complaint, it found Berkeley breached the contract, but University was not harmed by the breach. Berkeley's motion for judgment notwithstanding the verdict or for a new trial was denied. The trial court awarded costs to University. Berkeley appeals, challenging the judgment against it on its complaint and certain costs awarded.[1]

## DISCUSSION

### I.      Inconsistent Verdict

Berkeley contends the findings of the jury contained in the special verdict are fatally inconsistent, requiring a new trial.

A fact finder may not make inconsistent factual determinations based on the same evidence. (*Oxford v. Foster Wheeler LLC* (2009) 177 Cal.App.4th 700, 707 (*Oxford*).) " 'An inconsistent verdict may arise from an inconsistency between or among answers within a special verdict [citation] or irreconcilable findings. [Citation.] Where there is an inconsistency between or among answers within a special verdict, both or all the questions are equally against the law. [Citation.] The appellate court is not permitted to choose between inconsistent answers.' " (*Id*. at p. 716.) " 'The proper remedy for an inconsistent special verdict is a new trial.' " (*Trejo v. Johnson & Johnson* (2017) 13 Cal.App.5th 110, 124.) "The standard of review for inconsistency in a special verdict is de novo." (*Ibid*.)

---

[1]      The two appeals have been consolidated.

When "the jury's findings are so inconsistent that they are incapable of being reconciled and it is impossible to tell how a material issue is determined, the decision is 'against law,' " justifying a new trial. (*Oxford*, *supra*, 177 Cal.App.4th at p. 716.) If the verdict is not hopelessly ambiguous or fatally inconsistent, the court may interpret the verdict, considering its language and anything in the proceeding that serves to show with some certainty what the jury intended. The court may consider the pleadings, the evidence, the admissions of the parties, the instructions, and the forms of verdict submitted. (*Zagami, Inc. v. James A. Crone, Inc.* (2008) 160 Cal.App.4th 1083, 1092; *West v. Duncan* (1962) 205 Cal.App.2d 140, 143.)

An example of a fatally inconsistent verdict is found in *Shaw v. Hughes Aircraft Co.* (2000) 83 Cal.App.4th 1336 (*Shaw*). Shaw sued his former employer, Hughes, for wrongful termination, breach of contract, and breach of the implied covenant of good faith and fair dealing. On appeal, Hughes contended the award for breach of the covenant of good faith and fair dealing had to be set aside because the jury found there was no breach of contract. (*Id.* at p. 1344.) "Shaw's contract, bad faith and wrongful termination claims all turned on the same allegation—that Hughes fired him without good cause." (*Ibid*.) On the breach of contract claim, Shaw was required to prove his contract permitted termination only for cause and Hughes did not have cause to discharge him. On the breach of covenant claim, he was required "to establish a contract, performance, conduct by Hughes that was 'separate and apart from the performance of obligations under the contract, without good faith and for the purpose of depriving [Shaw], as employee, of rights and benefits under the contract.' " (*Id.* at p. 1345.)

The court stated: "The jury's finding that there was no breach of contract implies it believed Shaw was an at-will employee. The other possibility, that Hughes had cause to dismiss Shaw, is refuted by the wrongful termination verdict," which determined Shaw was terminated because he was a whistleblower, not for good cause. (*Shaw*, *supra*, 83 Cal.App.4th at p. 1345.) "Yet the finding that Hughes acted in bad faith implies the jury

5.

believed Shaw could only be dismissed for cause. The upshot is findings that are irreconcilable: that Shaw was an at-will employee and that he was not." (*Ibid*.) The court concluded the jury's finding that there was no breach of contract was irreconcilable with its finding that Hughes breached the covenant of good faith and fair dealing, so both claims had to be retried. (*Id.* at p. 1344.)

Initially, we reject University's argument that a different analysis applies because the verdict in this matter was a general verdict with special findings, rather than a special verdict. "The verdict of a jury is either general or special. A general verdict is that by which they pronounce generally upon all or any of the issues, either in favor of the plaintiff or defendant." (Code Civ. Proc., § 624.) In a special verdict, the jury finds the facts only, leaving nothing to the court but to draw conclusions of law from the facts and enter judgment. (*Ibid*.)

University argues the verdict was a general verdict with special findings, citing a statement in the judgment that: "the cause was submitted to the jury with directions to return a verdict with special findings." It has not identified anything in the verdict form itself that supports its characterization. The verdict form contains no general verdict; it contains no general finding in favor of Berkeley or University on the claims presented by the complaint, or on the claims presented by the cross-complaint. Rather, the verdict contains only specific factual questions, requiring the jury to find the facts only, and leaving the conclusions of law and the judgment to the court. (Code Civ. Proc., § 624.) The trial court subsequently entered a judgment which, after setting out the verdict verbatim, ordered, adjudged, and decreed that Berkeley "shall take nothing on its complaint," and University "shall take nothing on its cross-complaint." Consequently, we conclude the verdict falls within the definition of a special verdict found in Code of Civil Procedure section 624.

The verdict form first presented questions concerning Berkeley's claims for breach of contract and breach of the implied covenant of good faith and fair dealing. It

6.

separately set out questions concerning the breach of contract cause of action asserted by University in its cross-complaint.

On Berkeley's causes of action for breach of contract and breach of the covenant of good faith and fair dealing, the jury determined the parties entered into a contract. It was then asked "Did Berkeley Cement, Inc. do all, or substantially all, of the significant things that the contract required it to do? [¶] … [¶] Or [¶] Was Berkeley Cement, Inc. excused from having to do all, or substantially all, of the significant things that the contract required it to do?" The jury did not check either yes or no on the former question, but answered the latter question "yes." It also found that University did not "fail to do something that the contract required it to do" and did not "unfairly interfere with Berkeley Cement, Inc.'s right to receive the benefits of the contract."

On University's breach of contract cause of action, the jury found that University did "all, or substantially all, of the significant things that the contract required it to do," that "all the conditions that were required for Berkeley Cement, Inc.'s performance" occurred or were excused, and that Berkeley failed to do something the contract required it to do. The jury also concluded, however, that University was not harmed by that failure.

Berkeley contends the verdict was fatally inconsistent because, on its breach of contract cause of action, the jury found it was excused from having to do all, or substantially all, of the significant things that the contract required it to do, but on University's breach of contract cause of action, the jury found Berkeley breached the contract. Berkeley contends it could not have been excused from performance and at the same time be in breach of the contract.

On Berkeley's breach of contract claim, the trial court instructed the jury that Berkeley was required to prove:

"1.     That [Berkeley] and University entered into a contract;

7.

"2.    That [Berkeley] did all, or substantially all, of the significant things that the contract required it to do;

"3.    That all conditions required by the contract for University's performance had occurred;

"4.    That University failed to do something that the contract required it to do; and

"5.    That [Berkeley] was harmed by that failure."

Regarding the second element, the trial court also instructed:

"University contends that [Berkeley] did not perform all of the things that it was required to do under the contract, and therefore University did not have to perform its obligations under the contract.  To overcome this contention, [Berkeley] must prove both of the following:

"1.    That [Berkeley] made a good faith effort to comply with the contract; and

"2.    That University received essentially what the contract called for because [Berkeley's] failures, if any, were so trivial or unimportant that they could have been easily fixed or paid for."

The findings that Berkeley was "excused from having to do all, or substantially all, of the significant things that the contract required it to do," is consistent with its finding that Berkeley "failed to do something that the contract required it to do," if the jury concluded Berkeley was excused from "substantially all" of its significant contract obligations, and failed to do only trivial or unimportant things required by the contract. That interpretation is also consistent with the jury's finding that, although Berkeley "failed to do something that the contract required it to do," University was not harmed by that failure.  We conclude the jury's findings were not fatally inconsistent, and the verdict was not against law.

## II.    Jury Instruction

Berkeley's third cause of action was for breach of the implied warranty of the correctness of the plans and specifications.  It alleged that, by furnishing the plans, specifications, and other information for the project, University impliedly warranted

8.

those items were accurate; University allegedly breached the warranty by furnishing plans and specifications that were not accurate and would not produce the results University required Berkeley to achieve. Berkeley sought compensation for costs it incurred as a result of the allegedly inaccurate and incomplete plans and specifications.

In this appeal, Berkeley acknowledges a cause of action for breach of the implied warranty of correctness must be based on design specifications. Design specifications are explicit, detailed specifications that tell the contractor exactly how to perform the contract, allowing no deviation. (*Connor Bros. Constr. Co. v. U.S. (*Fed.Cl. 2005) 65 Fed.Cl. 657, 685.) Berkeley further contends the trial court erroneously instructed the jury that certain specifications in the contract were performance specifications as a matter of law. Performance specifications set forth a standard to be achieved and require the contractor to determine how to achieve it. (*Ibid.*) Berkeley asserts the instruction precluded it from presenting evidence and arguing that the specifications were design specifications and that University was liable for any defects in those specifications on a theory of breach of the implied warranty of correctness of the specifications.

An erroneous or misleading jury instruction is an error of law, for which a new trial may be granted. (Code Civ. Proc., § 657, subd. (7); *Bristow v. Ferguson* (1981) 121 Cal.App.3d 823, 826.) "We review the legal adequacy of jury instructions under the de novo standard of review." (*Davis v. Honeywell Internat., Inc*. (2016) 245 Cal.App.4th 477, 495.)

The trial court instructed the jury with jury instruction No. 329S, as follows:

"As a matter of law, Specification 01334 dealing with Shop Drawings, Product Data, Specification 03100 dealing with Concrete Forms and Accessories and Samples and Specification 03300 dealing with Cast-in-Place Concrete, which are part of the contract documents, are performance specifications, not design or prescriptive specifications. The contractor must exercise skill and judgment in selecting the means, methods and equipment necessary to meet the end result called for in the specifications."

9.

"A contractor of public works who, acting reasonably, is misled by incorrect plans and specifications issued by the public authorities as the basis for bids and who, as a result, submits a bid which is lower than he would have otherwise made may recover in a contract action for extra work or expenses necessitated by the conditions being other than as represented. [Citations.] This rule is mainly based on the theory that the furnishing of misleading plans and specifications by the public body constitutes a breach of an implied warranty of their correctness." (*Souza & McCue Constr. Co. v. Superior Court* (1962) 57 Cal.2d 508, 510–511.)

A similar rule exists under federal law: "[I]f the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications." (*United States v. Spearin* (1918) 248 U.S. 132, 136.) " 'Detailed design specifications contain an implied warranty that if they are followed, an acceptable result will be produced.' " (*PCL Constr. Servs., Inc. v. U.S.* (Fed.Cl. 2000) 47 Fed.Cl. 745, 794 (*PCL*).)

"The *Spearin* doctrine has been discussed and clarified over the years, often with the words 'design' and 'performance' specifications used to differentiate between contracts for which the specifications warranty does and does not apply. [Citations.] The warranty applies only to 'design specifications' because only by utilizing specifications in that category does the government deny the contractor's discretion and require that work be done in a certain way." (*PCL*, *supra*, 47 Fed.Cl. at p. 795.) "Performance specifications 'set forth an objective or standard to be achieved, and the successful bidder is expected to exercise his ingenuity in achieving that objective or standard of performance, selecting the means and assuming a corresponding responsibility for that selection.' " (*Blake Const. Co., Inc. v. U.S.* (Fed.Cir. 1993) 987 F.2d 743, 745 (*Blake*).) "[I]n a performance contract, the contractor must assume responsibility for the means and methods selected to achieve the end result." (*Penguin Industries, Inc. v. United States* (1976) 209 Ct.Cl. 121, 125.)

10.

"Design specifications, on the other hand, describe in precise detail the materials to be employed and the manner in which the work is to be performed.  The contractor has no discretion to deviate from the specifications, but is 'required to follow them as one would a road map.' " (*Blake, supra,* 987 F.2d at p. 745.)  "Many government specifications, however, include both design and performance provisions.  [Citation.]  Thus, when a contractor alleges a violation of the *Spearin* warranty, it is helpful to identify the specific provisions at issue in light of the contractor's allegations; determine if these provisions are performance specifications (for which the contractor had discretion to determine how to perform), or design specifications (for which the contractor had no such discretion); and then determine if the problems alleged by the contractor were caused by the design specifications, or by factors unrelated to whether the specification was impossible to perform." (*PCL, supra*, 47 Fed.Cl. at p. 796.)

Jury instruction No. 329S was apparently the result of the trial court's ruling on a motion in limine filed by Berkeley.[2]  In the motion, Berkeley sought a determination that it was not responsible for the concrete mix design of the self-consolidating concrete because certain specifications, including specification 03300, were design specifications, the results of which University was responsible.  The trial court denied the motion, concluding specification 03300 was a performance specification, which set the parameters within which Berkeley was to perform.  The trial court determined:

> "The interpretation of a contract is a question of law and [Berkeley] has not identified an ambiguity in the contract at issue.  [Berkeley] contracted to provide a self-consolidating concrete mix.  The Court interprets section 03300,[3] and in particular part 2.7, as a performance specification.  Strength, appearance and waterproofing were the critical performance

---

[2]    The issue was presented in Berkeley's motion for summary adjudication, or in the alternative motions in limine, Nos. 1–3.  Because the motion was untimely as a motion for summary adjudication, the trial court treated it as a motion in limine.

[3]    All further references to sections are to the SSMB bid release one, addendum No. 1.1 to the contract documents unless otherwise indicated.

factors for the concrete contractor. For appearance purposes, University required self-consolidating concrete (SCC). The SCC was to be free of bug-holes (1.4 F.2). The only criteria placed on the concrete contractor was that its mix, forms, pour, and curing were to be within the range of guidelines set forth in applicable ACI, ASTM and other designated industry publications. [Berkeley] does not suggest or argue that compliance with the ACI, ASTM and/or other industry publications set forth unreasonable criteria for it to meet the performance (finished product) specifications."

Berkeley contends specification 03300 constituted a design specification as a matter of law, and giving jury instruction No. 329S was therefore an error of law.[4] Berkeley focuses on sections 2.3 through 2.7 and 3.3 as demonstrating specification 03300 constituted a design specification. It supports its argument with references to the testimony of the parties' experts.

Section 2.3 of specification 03300 listed various concrete materials and section 2.4 listed admixtures and additives. Both referenced ASTM standards, but neither provided specifics about their use, such as amounts to use. The entries for some ingredients included instructions such as "provide in necessary dosage to achieve specified shrinkage," "provide in necessary dosage to accelerate set," and "provide in necessary dosage to facilitate placement, achieve specified finish requirements and necessary workability." Regarding the aggregate for architectural exposed concrete, section 2.3(B) provided: "Acquire all aggregates for entire project from a single source. Aggregates shall be sourced from George Reed-Merced River … or equal source. An equal source must produce aggregates of the same color, consistency and uniformity as the George Reed-Merced River, to match control sample provided by the University's Representative." These sections did not specify a particular concrete mix but identified the components that could be used and the published industry standards that would apply.

---

**4** Berkeley presents no argument challenging jury instruction No. 329S as it relates to specifications 01334 or 03100. Consequently, we address only whether the instruction was proper as to specification 03300.

The designation of aggregate by name permitted deviation, so long as the substitute aggregate produced "the same color, consistency and uniformity" as the product named.

Likewise, section 2.5, regarding accessory materials, and section 2.6, regarding bonding, waterproofing, and jointing products, did not specify a particular concrete mix to be used. In some cases, the sections simply described the type of product allowed, in other cases it named a manufacturer's product that could be used, but allowed use of an "equal" product.

Section 2.7(E) expressly addressed self-consolidating concrete. It set out standards for compressive strength and shrinkage, maximum and minimum limits on spread, and maximum aggregate size. (§ 2.7(E)(2), (6), (7), (11).) It listed certain cementitious materials and placed maximum or minimum limits, or both, on their use, but provided "[t]he exact percentages of the selected supplementary cementitious materials shall be determined by a successful test placement onsite." (§ 2.7(E)(3).) It directed Berkeley to "[a]djust proportions of Coarse Aggregates and Fines (including [some of the listed cementitious materials]) as required to achieve a consistent and stable mix design." (§ 2.7(E)(4).) Other ingredients were to be added "as required" to achieve a particular result. (§ 2.7(E)(9), (10).)

Section 2.7(F) and (G) contained similar provisions for normal weight concrete that was not self-consolidating concrete. Section 2.7(D), applicable to concrete mixes in general, provided: "Mix design adjustments may be requested by [Berkeley] when job conditions, weather or test results warrant."

Berkeley also contends section 3.3 of specification 03300 dictated how it was to place and pour the concrete, and therefore constituted a design specification. Section 3.3 provided the concrete was to be placed in accordance with ACI standards, the self-consolidating concrete was not to be vibrated, columns and walls were to be placed in single lifts between floors, and concrete was to be placed "in horizontal layers and in a manner to avoid inclined joints" and cold joints. (§ 3.3(A), (B), (C), (F), (R).) There

13.

were provisions for following ACI recommendations for cold and hot weather; Berkeley was also authorized to adjust the mix for cold weather, and take appropriate steps in hot weather, including, but not limited to, a list of possible steps provided. (§ 3.3(D), (E).) Section 3.3 also noted "[u]niform appearance of Architectural Exposed Concrete is most important," and directed Berkeley to "[p]lace concrete using techniques that minimize entrapped air and bugholes … , and eliminate any appearance of lift lines." (§ 3.3(Q).)

Berkeley contends these specifications are like the specification addressed in *Haehn Management Co. v. United States* (1988) 15 Cl.Ct. 50 (*Haehn*), which the court concluded was a design specification. There, the contractor contracted with the United States Navy to seal joints in the concrete pavement of an airfield. The contract contained detailed requirements for the sealant and detailed instructions for its application; it also specified the type of machine to be used to apply it. (*Id*. at pp. 52–54.) After the contractor applied the sealant, deficiencies appeared. The contractor replaced the sealant under protest and made a claim for equitable adjustment. The court recognized that "[a] claim based on defective specifications can only be maintained if the contract incorporates design rather than performance specifications." (*Id*. at p. 56.)

Based on its analysis of the specification and the testimony of witnesses, the court concluded the specification was predominantly a design specification, because it tightly circumscribed any latitude of the contractor. (*Haehn*, *supra*, 15 Cl.Ct. at p. 56.) The specification provided the sealant was to consist of two components, whose ingredients were set out. "The mixing ratio … was to be, by volume, one part Component A to one part Component B plus or minus 5 percent variation, and the sealant had to attain a tack-free condition within three hours after application." (*Id*. at p. 53.) The sealant was to be subjected to 11 laboratory tests; nine corresponding standards were specified. "A significant number of these, under color of performance standards, were, in fact, particular physical properties of the proposed material, such as viscosity, resilience, and flame resistance. Their measurements were precise requirements of the Specification."

14.

(*Ibid*.)  "The contract specifications also prescribed in detail the type of equipment and methods to be used by the contractor in the performance of the joint sealant work." (*Id*. at p. 54.)  It required that the sealant be machine-mixed and applied by a particular type of machine.  (*Ibid*.)  Because the specification contained "detailed measurements, tolerances, and materials, *i.e.,* elaborate instructions as how to perform the contract, … in contrast to operational characteristics and specifications that leave the details of how to comply with the contract up to the contractor," the court concluded the specification was a design specification.  It concluded the contractor was entitled to payment for the additional work done.  (*Id*. at pp. 56–62.)

University contends this case is more like *Aleutian Constructors v. United States* (1991) 24 Cl.Ct. 372 (*Aleutian*), where the court found the challenged specification was a performance specification.  In *Aleutian*, the plaintiff contracted to construct an airplane hangar for the Air Force in an area of Alaska known for extreme weather conditions. High winds partially destroyed a portion of the roof.  (*Id*. at p. 374.)  The plaintiff repaired the roof at its cost, then filed a claim for equitable adjustment of the contract price to cover the cost of the repairs.  (*Id*. at pp. 376–377.)  The roof consisted of a rubber-like plastic membrane stretched over a roof deck and fastened with metal fasteners.  (*Id*. at p. 374.)  The specifications provided that " 'membrane, flashing, and adhesives shall be the standard products of a single manufacturer' " and " 'fasteners shall be of the types and sizes best suited for the purpose and shall comply with roofing manufacturer's approved instructions.'  Wood to which the membrane was to be attached was to be preservative-treated." (*Id*. at p. 375.)  The plaintiff was to provide shop drawings with installation details.  A note on the contract drawings required the plaintiff to " 'provide calculations to verify that roofing fastening system can withstand an uplift force of 80 p.s.f.' " (*Ibid*., capitalization omitted.)  The plaintiff asked to change the manner in which the membrane was fastened to the wooden supports, and approval was

conditionally granted. After the membrane was installed, it was damaged by high winds. (*Id*. at p. 376.)

The contract described the materials and methods to be used in construction and included some limited detailed drawings of the work. "However, crucial elements still required [the plaintiff's] ingenuity and expertise to achieve the government's desired performance. Even though a contract may contain some design specifications, when a crucial element of a contract requires the contractor to use its own expertise and ingenuity, a *Spearin* warranty does not arise as to that element of the contract." (*Aleutian*, *supra*, 24 Cl.Ct. at p. 379.) The court concluded one crucial element, the requirement of withstanding an uplift force of 80 p.s.f., was a performance specification, because there was no road map detailing how the plaintiff was to satisfy the requirement. The pertinent drawing did not show how many layers of membrane to use, make any reference to disk anchors, or indicate where they were to be placed. The design and installation of the roofing system to meet that requirement were left to the plaintiff's ingenuity, expertise, and judgment. (*Ibid*.) Even after the defendant agreed to allow the plaintiff to use a different method of fastening the membrane to the wooden support system, the specifics of meeting the 80 p.s.f. requirement remained the plaintiff's responsibility. (*Id*. at p. 380.) Consequently, the plaintiff was not entitled to recover its additional costs. (*Id*. at p. 390.)

We conclude specification 03300 was not as precise and elaborately detailed as the specification in *Haehn,* and did not "tightly circumscribe[] any latitude of the contractor." (*Haehn*, *supra*, 15 Cl.Ct. at p. 56.) While the descriptions of certain ingredients permitted in the mix included limitations on the amounts to be used, no set amount or combination of ingredients was required. Further, crucial elements required Berkeley's ingenuity and expertise to achieve the expressed goal. For example, the specification set goals for strength, slump, and shrinkage, leaving it to Berkeley's discretion to determine how to meet those goals. Regarding placement of the concrete, the specification directed

Berkeley to take special precautions in hot weather, "to prevent slump loss, rapid setting, and plastic shrinkage," but left it to Berkeley to determine the method and means to do so, while suggesting some possibilities. The specification also set uniform appearance as a goal for the architectural concrete and directed Berkeley to place the concrete using techniques to minimize bug holes and eliminate lift lines.[5]

Like the trial court, we conclude that, considering the portions of the specification in issue in this case, specification 03300 indicates Berkeley, as the concrete contractor, was responsible for developing the final concrete mix designs for the project, including the mix design for the self-consolidating concrete. The specifications provided parameters for the mix designs and objectives to be achieved but did not dictate the final concrete mix designs or the method of placement of concrete. Berkeley was given discretion to use its expertise in developing the design mix and in placing the concrete.

Berkeley seems to argue the testimony of its expert supported its interpretation of the specification as a design specification. Berkeley's expert offered this definition from the National Ready Mix Concrete Association: " 'A performance specification for concrete materials establishes performance indicators measured by standard tests [*sic*] methods with defined acceptance criteria stated in contract documents and with no accompanying restrictions on concrete mixture proportions.' " He likened the concrete specification in the parties' contract to a cake recipe, which designates the ingredients to include in the mixture, suggesting the specification, which listed ingredients for the concrete, was a design specification.

University's expert, however, testified the specification for the concrete mix provided ranges, not specific amounts, and specified compressive strength and shrinkage goals to meet. It was a performance specification. It gave "the ready mix suppliers the

---

**5**      Lift lines are lines that appear in the concrete when a portion of the concrete is poured, and it begins to set up before additional concrete is poured on top.

latitude to use their techniques" to develop the mix. To the extent expert evidence was admissible on the issue of contract interpretation,[6] the evidence was conflicting and there was substantial evidence in the testimony of University's expert to support the trial court's interpretation.

We conclude the trial court did not err in instructing the jury that specification 03300 of the contract constituted a performance specification, and Berkeley was required to exercise its skill and judgment in selecting the means, methods, and equipment necessary to meet the end result called for in the specification.

## III. Termination of Cross-Examination of Witness

Berkeley contends the trial court violated its right to a fair trial by cutting short its cross-examination of one witness, Gary Knox. It asserts the trial court told its counsel, prior to the testimony of Knox, that Berkeley would have three hours to cross-examine the witness, but after an hour and a half, the trial court terminated its cross-examination without prior notice it would do so.

Every court has the power "[t]o provide for the orderly conduct of proceedings before it …." (Code Civ. Proc., § 128, subd. (a)(3).) "The court shall exercise reasonable control over the mode of interrogation of a witness so as to make interrogation as rapid, as distinct, and as effective for the ascertainment of the truth, as may be, and to protect the witness from undue harassment or embarrassment." (Evid. Code, § 765, subd. (a).)

"A trial court has the inherent authority and responsibility to fairly and efficiently administer the judicial proceedings before it. [Citations.] This authority includes the

---

[6]     Berkeley raises no issue regarding the admissibility or consideration of expert testimony on this issue. We note that the trial court denied Berkeley's motion in limine No. 1, which sought a determination that specification 03300 was a design specification, prior to trial and any trial testimony. Its decision was based on a conclusion the specification was a performance specification. The record does not indicate what, if any, expert evidence was before the trial court when it reached that conclusion.

18.

power to supervise proceedings for the orderly conduct of the court's business and to guard against inept procedures and unnecessary indulgences that tend to delay the conduct of its proceedings.  [Citation.]  In this vein, the court has the power to expedite proceedings which, in the court's view, are dragging on too long without significantly aiding the trier of fact. [Fn. omitted.]"  (*California Crane School, Inc. v. National Com. for Certification of Crane Operators* (2014) 226 Cal.App.4th 12, 22 (*California Crane*).)

"The Evidence Code expressly empowers trial judges to limit the presentation of evidence, even evidence that is relevant and probative.  Evidence Code section 352 authorizes the court to exclude evidence if its probative value is substantially outweighed by the probability that its admission will necessitate *undue consumption of time*.  Evidence Code section 765, subdivision (a) provides that the court *shall* exercise control over the mode of interrogation of witnesses 'so as to make interrogation as rapid, as distinct, and as effective for the ascertainment of truth.'  Both statutes describe powers that the court may exercise on its own initiative."  (*California Crane*, *supra*, 226 Cal.App.4th at pp. 19–20.)

"It is incumbent upon trial judges to manage trials efficiently.…  Judges need to be proactive from the start in both assessing what a reasonable trial time estimate is and in monitoring the trial's progress so that the case proceeds smoothly without delay."  (*California Crane*, *supra*, 226 Cal.App.4th at p. 20.)  "However, the court must permit a party to have his day in court.  Denying a party the right to testify or offer evidence deprives him of a fair trial and constitutes reversible error."  (*Id*. at pp. 22–23.)

In *California Crane*, although the plaintiffs estimated trial would take four to six weeks, the trial court opined it should last no more than 10 days because pretrial proceedings had narrowed the issues.  (*California Crane*, *supra*, 226 Cal.App.4th at p. 17.)  Based on a ruling on a motion in limine, the trial court later added two days to the estimate.  The plaintiffs' counsel exceeded his allotted time for opening statement, then spent almost seven days questioning three witnesses.  (*Id*. at pp. 17, 23.)  The defendants

19.

began their case-in-chief on the afternoon of the eighth day, the plaintiffs were permitted to present two more witnesses briefly, and the case went to the jury late on the 11th day of testimony. (*Id*. at pp. 23–24.) On appeal, the plaintiffs complained they were unable to present seven other witnesses, and to present evidence to rebut the defendants' evidence, because of the trial court's tight time constraints. (*Id*. at p. 24.)

We concluded "[t]he trial court did not abuse its discretion in controlling the trial proceedings as it did." (*California Crane*, *supra*, 226 Cal.App.4th at p. 23.) The case presented only two tort claims, the timeframe the trial court set for the case was reasonable, and the plaintiffs "did not object or provide any rationale why the trial could not be completed within that time period." (*Ibid*.) Further, any problems the plaintiffs had in presenting their case arose because they did not manage their case-in-chief in a manner that allowed time for additional witnesses or rebuttal. "[R]ather than calling the individual [plaintiffs] to present their claims, counsel kept adverse witnesses … on the stand for five of [the plaintiffs'] allotted trial days." (*Id*. at p. 24.) We also concluded, in light of the evidence received and the jury's findings, that the exclusion of evidence did not prejudice the plaintiffs, because it was not reasonably probable a result more favorable to the plaintiffs would have been reached if the excluded evidence had been admitted. (*Ibid*.)

Prior to trial, Berkeley estimated the trial would take four weeks, with three weeks for Berkeley's case and one week for University's; the trial court offered the month of December 2015. On the first day of trial testimony, Berkeley called one witness; his testimony was complete by 2:30 p.m. Berkeley had no other witness for that day, so the jury was excused early. The trial court noted Berkeley did not appear to be prepared for trial; besides the absence of another witness, Berkeley had not yet designated the documents it intended to use at trial. On the second day of testimony, the trial court expressed its frustration with Berkeley's lack of preparedness and failure to comply with its order that Berkeley give University 24 hours' notice of the documents it intended to

20.

use with each witness. After lunch the same day, the trial court expressed concern about "not making efficient use of jurors' time" and whether trial would be completed by December 31. Throughout the trial, the trial court expressed its frustration with Berkeley's lack of preparedness and its concern about the potential for a mistrial if any delay resulted in the loss of jurors; University also complained about Berkeley's consumption of trial time.

On December 18, 2015, the court advised counsel it would begin losing jurors on January 15, 2016, if the trial was not completed. It ordered Berkeley to complete its presentation of percipient witnesses by December 31, 2015, and allowed University the remaining time. It made an exception for Knox, allowing Berkeley to present Knox's testimony by cross-examination when he was called by University to testify in January. The trial court reserved the right to adjust the schedule to keep it fair, depending on whether the examination stayed focused on the critical issues, which it listed.

On January 5, 2016, one juror was released from jury duty and replaced with an alternate. On January 7, 2016, at the end of the day, the trial court noted it was in danger of losing one juror and two alternates before the case was decided. It terminated University's cross-examination of witness John Hurtado without warning, although University had expected to continue it the next day.

On January 12, 2016, the trial court told the parties University would have one and one-half days to question Knox, and Berkeley would have one-half day, or three hours, for cross-examination. The trial court asked Berkeley's counsel if he could finish in an hour and a half; counsel indicated he would "do [his] best to expedite the process," but he expected to take three hours. University questioned Knox for about two hours. Berkeley questioned him for an hour and a half, until the end of the day. After releasing the jury for the day, the trial court advised the parties it was terminating Berkeley's cross-examination of Knox. It indicated it did not feel Berkeley was using its time efficiently or addressing the material issues and was straying into peripheral matters.

21.

The next morning, Berkeley filed a motion in limine, requesting it be allowed to continue its cross-examination of Knox, or, in the alternative, that the trial court admit certain documents Berkeley had intended to introduce during its examination of Knox. In response, the trial court explained its frustration with the pace of Berkeley's cross-examination. It noted it gave University a day and a half for direct examination, but University finished in two hours. The trial court recapped the many subjects University covered in that time. It noted Berkeley took an hour and a half, and covered only a few subjects; the cross-examination rambled and addressed irrelevant matters. The trial court also noted that, overall, University had taken about one-third the trial time that Berkeley had taken. In accordance with Berkeley's motion, the trial court proposed that, in lieu of bringing Knox back for further testimony, the documents Berkeley sought to introduce through examination of Knox be admitted without further foundation. Both parties accepted that ruling.

We review the trial court's trial time management rulings for abuse of discretion. (*California Crane*, *supra*, 226 Cal.App.4th at pp. 17, 24.) Initially, we reject Berkeley's argument that the trial court cut off its cross-examination of Knox without warning, that is, that it "did not give any indication that it would consider shortening the time for [Berkeley] to cross-examine Mr. Knox if [Berkeley's] cross-examination did not meet the Trial Court's expectations." Berkeley had warning throughout the trial that time was limited, and the trial court expected the parties to use their time efficiently and not stray into irrelevant areas or waste the court's and the jury's time. When the trial court set a schedule, it expressly advised the parties it was reserving the right to adjust the schedule, depending on how the examination of witnesses went and whether it stayed focused on material issues. The trial court subsequently did make adjustments to the schedule. Berkeley also had clear warning that the trial court might terminate examination at any time, because it terminated University's cross-examination of Hurtado, based on the potential for a loss of jurors and a resulting mistrial. Thus, Berkeley had ample warning

22.

time was limited, and it was required to use its time efficiently and focus on the material issues; if it did not, the trial court might terminate Berkeley's examination and move on.

Berkeley has not demonstrated that the limitation of the cross-examination of Knox constituted an abuse of the trial court's discretion. Berkeley does not challenge the trial court's explanation of the reasons for its ruling; it does not challenge the trial court's finding that Berkeley was not proceeding efficiently in its examination of Knox. The trial court previously had admonished the parties to focus on material issues. It listed about nine matters University covered in its two hours of examination. It listed three matters Berkeley covered in its hour and a half of examination; it noted Berkeley's examination "frankly, kind of rambled," included questioning about prebid matters that were of little or no relevance and involved duplication of exhibits.

Further, Berkeley's written motion, presented the following morning, requested either a continuation of its cross-examination of Knox, or admission of the exhibits Berkeley intended to present through Knox's testimony. The trial court granted the latter request, admitting all but one of the exhibits proffered.[7]

Generally, "the appropriate test of abuse of discretion is whether or not the trial court exceeded the bounds of reason, all of the circumstances before it being considered." (*In re Marriage of Connolly* (1979) 23 Cal.3d 590, 598.) "Judicial discretion 'implies absence of arbitrary determination, capricious disposition or whimsical thinking. It imports the exercise of discriminating judgment within the bounds of reason.' " (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 957.) " 'The burden is on the party complaining to establish an abuse of discretion ….' [Citations.] '[T]he showing is insufficient if it presents facts which merely afford an opportunity for a difference of opinion.' " (*Brawley v. J.C. Interiors, Inc*. (2008) 161 Cal.App.4th 1126, 1138 (*Brawley*).) We conclude Berkeley has not demonstrated that the trial court's

---

**7** Berkeley withdrew its request that the remaining exhibit be admitted.

23.

decision to end cross-examination of Knox due to Berkeley's inefficient use of the limited trial time available was an abuse of its discretion.

We also conclude the termination of Berkeley's cross-examination did not violate its due process right to a fair trial. " 'The term "due process of law" asserts a fundamental principle of justice which is not subject to any precise definition but deals essentially with the denial of fundamental fairness, shocking to the universal sense of justice.' " (*In re Marriage of Carlsson* (2008) 163 Cal.App.4th 281, 290 (*Carlsson*).) In *Carlsson*, a marriage dissolution proceeding tried before the court, the trial judge manifested impatience with the husband's counsel and with the pace of proceedings throughout the trial. (*Id*. at p. 286.) At one point, the trial court ordered the husband to produce certain documents, to which his counsel asserted a Fifth Amendment privilege against self-incrimination. (*Carlsson,* at pp. 286–288.) While the husband's attorney was examining his expert witness, in mid-question, the judge suddenly announced a recess, left the courtroom, and did not return. (*Id*. at pp. 288–289.) He subsequently ruled against the husband on almost every issue. (*Id*. at p. 290.)

The court agreed with the husband that, "by abandoning the trial in the middle of his case-in-chief without giving him an opportunity to complete the presentation of evidence or offer rebuttal evidence, the trial court denied him his constitutional right to due process and a fair trial." (*Carlsson*, *supra*, 163 Cal.App.4th at p. 290.) "Unquestionably, the trial court has the power to rule on the admissibility of evidence, exclude proffered evidence that is deemed to be irrelevant, prejudicial or cumulative and expedite proceedings which, in the court's view, are dragging on too long without significantly aiding the trier of fact. If the court errs in any of these respects, its rulings may be reviewed by a higher court and, if prejudicial, the judgment will be reversed." (*Id*. at p. 291.)

The court, however, found the summary termination of the trial infringed on the husband's right to a full and fair hearing, an error which was reversible per se.

(*Carlsson*, *supra*, 163 Cal.App.4th at p. 291.)  Efforts to expedite cases " ' "should never be directed in such manner as to prevent a full and fair opportunity to the parties to present all competent, relevant, and material evidence bearing upon any issue properly presented for determination." ' " (*Ibid*, italics omitted.)  By arbitrarily cutting off the presentation of evidence, the trial judge rendered the trial fundamentally unfair and violated the husband's right to due process.  (*Id*. at p. 294.)

In *Bole v. Bole* (1946) 76 Cal.App.2d 344, another marriage dissolution case cited by Berkeley, the trial court refused the husband's request that it compel the attendance of the parties' son to testify to relevant matters and refused to admit relevant evidence on another material issue.  The court found the proffered evidence to be competent, relevant, and material, and concluded the trial court's refusal to receive the evidence was prejudicial error.[8]

Unlike *Bole*, here, the trial court did not exclude or refuse to receive Knox's testimony at all, nor did it prevent cross-examination altogether.  Unlike *Carlsson*, the trial judge did not abandon the trial before it was complete; he did not arbitrarily cut off the presentation of evidence.  One concern in *Carlsson* was that the judge, the trier of fact, appeared to have prejudged the case.  He displayed impatience and displeasure toward the husband's attorney and walked out of the trial before the husband's case had been fully presented.  Here, the trial judge was not the trier of fact, did not prejudge the case, and did not prematurely terminate the trial.

This case is more like *California Crane*, where the trial court set reasonable limits on the time for presentation of evidence, but a party did not make good use of the available time.  The trial court here put limits on the time for the parties' presentation of evidence because of circumstances that arose after trial began.  Berkeley underestimated

---

[8]     We note the court did not find the exclusion of the evidence to constitute a denial of a fair hearing or to be reversible per se.  It applied a prejudicial error standard.

how long its portion of the trial would take.  The trial court granted its request to extend the trial time into January, but some jurors indicated they would become unavailable after January 15, 2016.  Working with that deadline, the trial court allocated the time between the parties and admonished both parties to focus on the material issues.

Berkeley was afforded an opportunity to cross-examine Knox.  Berkeley was well aware of the time constraints on the trial.  It was also aware the trial court had already cut short the cross-examination of one witness because of those time constraints.  The trial court cut short Berkeley's cross-examination of Knox because Berkeley was not making good use of the limited time available, but was venturing into irrelevant or peripheral areas, not productive of evidence material to the issues.

We conclude the trial court's curtailment of Berkeley's time to question Knox did not violate its right to a fair trial by denying it an opportunity to present relevant evidence.  The trial court placed reasonable limits on the presentation of evidence, both in terms of the time allotted to each party and the requirement that the examination focus on evidence relevant to the material issues in the case.  The termination of Berkeley's cross-examination of Knox was the result of Berkeley's choices in using its opportunity, that is, pursuing the witness's testimony on marginally relevant matters rather than expediently eliciting the most cogent, relevant evidence the witness possessed.

We find no abuse of discretion or deprivation of a fair trial.

## IV.    Total Cost Method of Calculating Damages

Berkeley contends the trial court erred in excluding evidence it wished to present to prove its alleged damages using the total cost method of calculation.  Under the total cost method of calculating damages, damages are determined by subtracting the contract amount (the contractor's accepted bid amount) from the total cost of the contractor's performance.  (*Amelco Electric v. City of Thousand Oaks* (2002) 27 Cal.4th 228, 243 (*Amelco*); *JMR Constr. Corp. v. Environmental Assessment & Remediation Management, Inc*. (2015) 243 Cal.App.4th 571, 589.)  It generally has been used when there was no

other method available to compute the contractor's damages. (*Boyajian v. United States* (1970) 191 Ct.Cl. 233, 251.) The Supreme Court has noted the total cost method is "generally disfavored," must be used "with caution and as a last resort," and is "tolerated only when no other mode was available." (*Amelco*, *supra*, at p. 243.) " 'Clearly, the "actual cost method" is preferred because it provides the court … with documented underlying expenses, ensuring that the final amount of the equitable adjustment will be just that—equitable—and not a windfall for either the government or the contractor.' " (*Id*. at p. 244.)

Before the total cost method may be presented as a means to calculate damages, the trial court bears the initial responsibility of determining that each of four elements can be met: "(1) the impracticality of proving actual losses directly; (2) the plaintiff's bid was reasonable; (3) its actual costs were reasonable; and (4) it was not responsible for the added costs." (*Amelco*, *supra*, 27 Cal.4th at pp. 243–244.) If the contractor presents prima facie evidence of these elements, "the trier of fact then applies the same test to determine the amount of total cost or modified total cost damages to which the plaintiff is entitled." (*Id*. at p. 244.)

University filed a motion in limine to exclude evidence relating to the total cost method of calculating damages. The trial court conducted a three and one-half day hearing pursuant to Evidence Code sections 402 and 802, to permit Berkeley to attempt to meet the four element *Amelco* test. At the end, the trial court found there was "no evidence to support a contention that the added cost could not be calculated in a more precise way. Plaintiff has failed to meet [its] burden on that point." The court stated there was evidence Berkeley had "a cost accounting system designed specifically for use in construction projects where [it] could allocate expenses" that Berkeley contended were extra expenses, beyond the scope of the contract; Berkeley made no effort to use it to track the alleged additional expenses for the SSMB project. The trial court also noted Berkeley acknowledged some added costs were the result of its own defective work, but

27.

Berkeley's total cost method made no attempt to segregate out those costs, unlike its certified claim for equitable adjustment. Thus, the trial court found Berkeley failed to make a prima facie showing of the first *Amelco* element.[9]

In its briefs, Berkeley argues it satisfied all four *Amelco* elements, so it should have been permitted to present evidence of damages using the total cost method. We find the issue is moot in light of the jury's finding that University did not breach any obligation to Berkeley.

The total cost method is a method of calculating damages. It does not determine liability. Calculation of damages does not come into play unless liability is established. The jury found in favor of University on all three of Berkeley's claims: breach of contract, breach of the covenant of good faith and fair dealing, and breach of the warranty of correctness of the plans and specifications. Thus, there were no damages to calculate.

"An appellant bears the burden to show not only that the trial court erred, but also that the error was prejudicial in that it resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13; Code Civ. Proc., § 475.) An error is prejudicial and results in a miscarriage of justice only if the reviewing court concludes, based on its review of the entire record, that it is reasonably probable that the trial court would have reached a result more favorable to the appellant absent the error." (*Jones v. Farmers Ins. Exchange* (2013) 221 Cal.App.4th 986, 999.) Any error in excluding evidence of the total cost method of calculating damages was harmless in light of the jury's finding of no liability. Berkeley has not demonstrated any prejudice from the trial court's ruling on that issue.

Berkeley cites the standard of review that applies " '[w]hen all evidence on a particular claim is excluded based on a motion in limine,' " and asserts the trial court excluded "evidence of the total cost calculation *and breach of warranty claim*." (Italics

_____

[9]     The trial court later stated Berkeley failed to present any evidence on two key *Amelco* elements, the first and fourth.

added.)  The minute order it cites in support reflects the trial court's finding that Berkeley failed to meet its burden of proof of the elements necessary to present a total cost analysis of damages.  Nothing in the minute order precluded Berkeley from presenting evidence in support of its claim of breach of the warranty of correctness of the plans and specifications.

To the extent Berkeley is asserting it was prejudiced by being prevented from presenting evidence supporting its breach of warranty claim, the record does not support its contention.  The motion in limine addressed the method of calculating damages, and the trial court's order was limited to that.  Berkeley has identified nothing in the record that excluded evidence on its breach of warranty claim, and Berkeley did present evidence related to its warranty claim.  In fact, in his closing argument, Berkeley's counsel referred to the breach of warranty claim as the cause of action "we've spent a ton of time on."

Berkeley has not demonstrated any prejudicial error in the trial court's exclusion of evidence of the total cost method of calculating damages.

## V.    Costs

"The right to recover any of the costs of a civil action 'is determined entirely by statute.' " (*Anthony v. City of Los Angeles* (2008) 166 Cal.App.4th 1011, 1014.) Generally, the prevailing party is entitled as a matter of right to recover its costs.  (Code Civ. Proc., § 1032, subd. (b).)  The costs that are allowable are listed in Code of Civil Procedure section 1033.5, subdivision (a).  Items that "are not allowable as costs, except when expressly authorized by law" are listed in subdivision (b) of that section.  Items that are not listed as allowable or not allowable "may be allowed or denied in the court's discretion." (Code Civ. Proc., § 1033.5, subd. (c)(4).)  All costs awarded must be "reasonable in amount" and "reasonably necessary to the conduct of the litigation rather than merely convenient or beneficial to its preparation."  (Code Civ. Proc., § 1033.5, subd. (c)(2), (3).)

29.

Generally, the standard of review of an award of costs is whether the trial court abused its discretion in making the award. (*Seever v. Copley Press, Inc.* (2006) 141 Cal.App.4th 1550, 1556.) However, when the issue to be determined is whether the criteria for an award of costs have been satisfied, and that issue requires statutory construction, it presents a question of law requiring de novo review. (*Baker-Hoey v. Lockheed Martin Corp.* (2003) 111 Cal.App.4th 592, 596–597 (*Baker-Hoey*).)

"In ruling upon a motion to tax costs, the trial court's first determination is whether the statute expressly allows the particular item and whether it appears proper on its face. 'If so, the burden is on the objecting party to show [the costs] to be unnecessary or unreasonable.' [Citation.] Where costs are not expressly allowed by the statute, the burden is on the party claiming the costs to show that the charges were reasonable and necessary. [Citation.] 'Whether a cost item was reasonably necessary to the litigation presents a question of fact for the trial court and its decision is reviewed for abuse of discretion.' " (*Foothill-De Anza Community College Dist. v. Emerich* (2007) 158 Cal.App.4th 11, 29–30.)

Berkeley challenges two items of costs that were included in the award to University: (1) fees University paid to Berkeley's experts for time spent taking their depositions and (2) mediation fees.

### A. Expert witness fees

"Fees of experts not ordered by the court" are listed as nonallowable costs. (Code Civ. Proc., § 1033.5, subd. (b)(1).) Thus, they "are not allowable as costs, except when expressly authorized by law." (Code Civ. Proc., § 1033.5, subd. (b).) University has not cited any other statute applicable in this case that permits an award of expert deposition fees. Rather, it argues the "[f]ees of experts" category of nonallowable costs includes only fees paid to a party's own experts, and not fees paid by a party in order to take the depositions of an opposing party's experts; it contends the latter falls within the provision for a discretionary award of costs. (Code Civ. Proc., § 1033.5, subd. (c)(4).)

Thus, the issue presented is one of law, which we review de novo: whether the statute is properly construed to authorize or permit an award of costs for the fees paid to depose the opposing party's experts.

In *Ripley v. Pappadopoulos* (1994) 23 Cal.App.4th 1616 (*Ripley*), the court addressed a challenge to expert witness fees the trial court had awarded pursuant to a contractual provision that entitled the prevailing party to an award of its "reasonable attorney's fees and costs." (*Id.* at pp. 1621–1622.) The court cited the statutory provision that the fees of experts not ordered by the court are not allowable as costs unless expressly authorized by law. (*Id.* at p. 1624.) It observed: "If during discovery proceedings a party designates an expert, then any other party may depose the expert and may require the expert to give testimony before a court .… In that event the party desiring to depose the expert or requiring the expert to testify must pay the expert's fees for the time required for the deposition and/or testimony." (*Ibid.*) It noted the statute authorizing a party to take the deposition of an opponent's experts did not provide for the recovery of expert witness expenses in a cost award. (*Ibid.*)

The court modified the judgment by deleting the award of expert witness fees, concluding: "In numerous specific types of cases the Legislature has seen fit to require the losing party to reimburse the prevailing party for the payment of expert witness fees.… When the numerous statutory provisions in which expert witness fees are expressly declared recoverable are considered together with the express prohibition against the inclusion of such fees in a cost award otherwise, the Legislature's intent becomes clear. The Legislature has reserved to itself the power to determine selectively the types of actions and circumstances in which expert witness fees should be recoverable as costs and such fees may not otherwise be recovered in a cost award." (*Ripley*, *supra*, 23 Cal.App.4th at pp. 1624–1625.)

In *Baker-Hoey*, the defendant contended it was entitled to recover the customary hourly and daily fees that it paid to the plaintiffs' treating physicians in order to take their

31.

depositions. (*Baker-Hoey*, *supra*, 111 Cal.App.4th at p. 598.)  The defendant contended these costs were allowable as ordinary witness fees, because the discovery statute governing the depositions of treating physicians required that they be paid their " 'reasonable and customary hourly or daily fee for any time spent in deposition.' " (*Ibid*.)  The plaintiffs contended the deposition fees of the treating physicians were nonallowable expert witness fees.  (*Ibid*.)

The court concluded:  "[W]hile the treating physician is not a retained physician, the treating physician is clearly an expert.  Accordingly, the right to recover the fees charged by the treating physician for a deposition are recoverable [*sic*] only if the expert was ordered by the court [citation], and not otherwise." (*Baker-Hoey*, *supra*, 111 Cal.App.4th at p. 601.)  It rejected the defendant's attempt to "transmute the phrase 'ordinary witness fees' into a higher category entitled 'ordinary witness fees of treating physicians.'  Treating physicians are experts and recovery of their fees as costs are [*sic*] accordingly governed by section 1033.5's provisions governing expert witness fees, not the provisions applicable to ordinary witnesses." (*Ibid*.)  Further, "[i]n the absence of statutory authority that makes the costs incurred in deposing treating physicians recoverable by the prevailing party, the trial court correctly concluded that such costs are not recoverable." (*Id*. at p. 602.)

The language of Code of Civil Procedure section 1033.5, subdivision (b)(1) is clear:  "Fees of experts not ordered by the court" are not allowable costs, "except when expressly authorized by law."  University does not claim the experts whose depositions it took were ordered by the court.  Nor does it cite any express statutory authorization of recovery as costs of the fees paid to Berkeley's experts for their depositions.  We reject University's attempt to carve out an exception to the statutory language for fees paid to the opposing party's experts for their deposition time.  There is no such statutory exception in Code of Civil Procedure section 1033.5; we have not been cited to any statutory authorization for the recovery of the subject expert deposition fees.

University claimed and was awarded $6,486.25 for deposition fees paid to Berkeley's expert witnesses. The award of costs must be modified to exclude that amount.

### B. Mediation fees

Mediation costs are not listed among the costs that are expressly allowable or expressly not allowable. (Code Civ. Proc., § 1033.5, subds. (a), (b).) "An item not specifically allowable under subdivision (a) nor prohibited under subdivision (b) may nevertheless be recoverable in the discretion of the court if 'reasonably necessary to the conduct of the litigation rather than merely convenient or beneficial to its preparation.' " (*Ladas v. California State Auto. Assn.* (1993) 19 Cal.App.4th 761, 774 (*Ladas*).) Consequently, mediation costs fall within the category of costs that may be awarded in the trial court's discretion. (Code Civ. Proc., § 1033.5, subd. (c)(4).) "Whether a cost item was reasonably necessary to the litigation presents a question of fact for the trial court and its decision is reviewed for abuse of discretion." (*Ladas, supra*, at p. 774.)

" ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' [Citations.] 'The burden is on the party complaining to establish an abuse of discretion ….' [Citations.] '[T]he showing is insufficient if it presents facts which merely afford an opportunity for a difference of opinion.' " (*Brawley, supra*, 161 Cal.App.4th at pp. 1137–1138.)

The trial court's award of costs to University included $15,950 for fees University paid to mediators.[10] Berkeley challenges this award, arguing the costs were not

---

[10] The mediation fee award included $7,500 (University's one-half of the $15,000 mediator's fee) for a mediation that was canceled by Berkeley shortly before it was scheduled to take place, because Berkeley claimed it had discovered new evidence. The mediator could not fill the time slot with a replacement, and the fee became nonrefundable.

33.

"reasonably necessary to the conduct of the litigation," but were "merely convenient or beneficial to its preparation." (Code Civ. Proc., § 1033.5, subd. (c)(2).) It contends mediation was voluntary, not court-ordered, and therefore the fees for mediation were not mandatory or necessary to the litigation.

The court-ordered mediation scheme is governed by Code of Civil Procedure sections 1775 through 1775.15. Under those statutes, " 'mediation' means a process in which a neutral person or persons facilitate communication between the disputants to assist them in reaching a mutually acceptable agreement." (Code Civ. Proc., § 1775.1, subd. (a).) Trial courts are granted discretion to order cases to mediation as an alternative to judicial arbitration, and the costs of that mediation are borne by the court. (Code Civ. Proc., §§ 1775.2, 1775.3, 1775.4, 1775.5, 1775.8, 1141.18, 1141.28.) "The court shall not order a case into mediation where the amount in controversy exceeds fifty thousand dollars ($50,000)." (Code Civ. Proc., § 1775.5.)

"Amenability of a particular action for mediation must be determined on a case-by-case basis," and the decision to send it to mediation "must be made by the court after consideration of the expressed views of the parties on the amenability of the case to mediation." (Cal. Rules of Court, rule 3.891(a)(1), (b).) "Even after a case has been ordered to mediation, the mediator must inform the parties that participation in mediation is completely voluntary, refrain from coercing a party to continue its participation in the mediation and respect the right of each party to decide the extent of its participation or withdraw from the mediation." (*Jeld-Wen, Inc. v. Superior Court* (2007) 146 Cal.App.4th 536, 541; Cal. Rules of Court, rule 3.853.) "Voluntary participation and self-determination are fundamental principles of mediation that apply both to mediations in which the parties voluntarily elect to mediate and to those in which the parties are required to go to mediation in a mandatory court mediation program or by court order." (Advisory Com. com., Deering's Ann. Codes, Rules (2018 ed.) foll. rule 3.853.)

34.

As a practical matter, it is unlikely a trial court will order an action to mediation if the parties do not express interest in mediation or indicate it is not likely they will be able to resolve the matter through mediation. Whether the parties mediate pursuant to a private agreement to do so or pursuant to a court order, made after consulting the parties for their views on the amenability of the case to mediation, mediation is likely to occur only if the parties believe there is a realistic potential for reaching a settlement of the litigation.

Berkeley contends the mediation fees were not reasonably necessary, and therefore were not assessable as costs, solely because the mediation was voluntary, rather than court-ordered. We decline to adopt the blanket rule Berkeley advocates: that fees incurred for mediation that is not court-ordered are categorically not "reasonably necessary to the conduct of the litigation," and therefore are not allowable as costs as a matter of law.[11]

Under the statutes authorizing court-ordered mediation, the parties may have significant impact on the court's decision to order, or not order, the case to mediation, because the trial court must consider the expressed views of the parties on the amenability of the case to mediation before it makes the order. (Cal. Rules of Court, rule 3.891(a)(1).) If the trial court orders a case to mediation, we may take that as an indication of the court's belief mediation is reasonably necessary in that case. The absence of a court order, however, is not an indication mediation is not reasonably necessary, at least when the case did not qualify for court-ordered mediation.

Adopting Berkeley's suggested rule would amount to a finding that mediation is reasonably necessary only in some cases in which the amount in controversy is $50,000 or less, and is never reasonably necessary where the amount in controversy exceeds

---

[11] If the Legislature had intended such a categorical exclusion from cost awards, it could have easily included fees from mediation not ordered by the court in the list of costs that are not allowable (Code Civ. Proc., § 1033.5, subd. (b)).

$50,000. The fees in the latter cases would be disallowed without consideration of the circumstances of the particular case and whether, under those circumstances, mediation was a reasonably necessary means of attempting to resolve the dispute and avoid the expense of a trial. We decline to adopt such an arbitrary categorical rule.

In *Gibson v. Bobroff* (1996) 49 Cal.App.4th 1202 (*Gibson*), the court determined that an award of costs for court-ordered mediation could be made under the discretionary provision of the costs statute (Code Civ. Proc., § 1033.5, subd. (c)(4)). There, the plaintiff prevailed at trial, and was awarded costs, including his share of the mediator's fees from a pretrial mediation. (*Gibson*, *supra*, 49 Cal.App.4th at p. 1205.) On appeal, the defendants argued the trial court abused its discretion by awarding mediation fees as costs, because they were not reasonably necessary to the conduct of the litigation. (*Id*. at p. 1207.) The court held "that when an unsuccessful mediation has been court-ordered, reasonably necessary expenses incident thereto may, in the sound discretion of the trial court, be awarded after trial to a prevailing party." (*Id*. at p. 1209.) Although the *Gibson* court expressly did not "decide whether a party prevailing after a trial which is preceded by unsuccessful *voluntary* mediation would be entitled to such costs" (*Id.* at p. 1209, fn. 7), it recognized the need for mediation in litigation.

"Like the related arbitration scheme, mediation is fundamental to the conduct of litigation as it encourages the parties to settle their disputes before trial and exposes parties who fail to agree to a reasonable settlement proposal to the risk of a discretionary court determination that they should pay their opponent's share of the failed mediation." (*Gibson*, *supra*, 49 Cal.App.4th at p. 1209.) The court rejected the defendants' argument that, because the aim of mediation was to avoid trial, mediation costs could not be construed to be reasonably necessary to the conduct of the litigation. (*Id*. at p. 1209.) The court noted the same was true of contractual and judicial arbitration, the fees for which may be awarded as costs. "Encouraging the parties to resolve lawsuits at the earliest time and before a costly and time-consuming trial, is a necessary part of litigation

as conducted in this state. The award of mediation fees is no less reasonably necessary to the conduct of litigation, than the award of arbitrator's fees …, which costs are also statutorily authorized." (*Ibid.*)

We conclude mediation fees incurred for mediation that was not ordered by the court are not categorically nonrecoverable as "not reasonably necessary to the conduct of litigation." The question whether mediation fees should be awarded as costs in a particular matter must be determined based on the facts and circumstances of the particular action. Berkeley does not contend the trial court erred in assessing the facts and circumstances of this case, when it made its determination that the mediation fees should be awarded. Consequently, Berkeley has not established any reversible error in the trial court's award of mediation fees as costs.

## DISPOSITION

The judgment is modified to delete from the award of costs the amount of $6,486.25, which was awarded to University for deposition fees it paid to Berkeley's expert witnesses. As so modified, the judgment is affirmed. University is entitled to its costs on appeal.

_____

HILL, P.J.

WE CONCUR:


_____

DETJEN, J.


_____

SNAUFFER, J.

37.